RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0323P (6th Cir.)
File Name: 02a0323p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
 *Plaintiff-Appellee,*

 *v.*

No. 99-4437

PHILIP A. CHANCE,
 *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 99-00022—Kathleen McDonald O'Malley,
District Judge.

Argued: September 20, 2001

Decided and Filed: September 19, 2002

Before: BATCHELDER and COLE, Circuit Judges;
BECKWITH, District Judge.[*]

_____

### COUNSEL

**ARGUED:** Peter D. Goldberger, LAW OFFICE OF PETER GOLDBERGER, Ardmore, Pennsylvania, for Appellant.

_____

[*] The Honorable Sandra S. Beckwith, United States District Judge for the Southern District of Ohio, sitting by designation.

Frank J. Marine, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Peter D. Goldberger, LAW OFFICE OF PETER GOLDBERGER, Ardmore, Pennsylvania, for Appellant. Frank J. Marine, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Craig S. Morford, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

———————————

## OPINION

———————————

BECKWITH, District Judge.  Defendant-Appellant Philip A. Chance appeals his conviction and sentence on one count of conducting the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), one count of conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d), two counts of conspiring to obstruct, delay, or affect commerce through extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951(a), and one count of conspiring to obstruct the enforcement of the criminal laws of a state with the intent to facilitate an illegal gambling business, in violation of 18 U.S.C. § 1511.  The district judge sentenced Appellant to 71 months of imprisonment and two years of supervised release, and imposed a mandatory $500 special assessment.  In sentencing Appellant to 71 months of imprisonment, the district judge upwardly departed three levels from the applicable final offense level on the grounds that the fact that Appellant's conduct was undertaken as chief law enforcement officer of Mahoning County, Ohio was not taken into consideration by the Sentencing Guidelines.  The district court also imposed a two level increase in the offense level pursuant to U.S.S.G. § 3C1.1 for obstruction of justice on the grounds that Appellant committed perjury during the trial.  On appeal, Appellant challenges the sufficiency of the evidence supporting the convictions, the district court's decision to impose a sentencing enhancement for obstruction of justice, and the district court's decision to upwardly depart

well as the district court's stated reasons for the imposition of the particular sentence. *United States v. Crouse*, 145 F.3d 786, 789 (6th Cir. 1998). We will remand for resentencing if the district court fails to justify the extent of the departure. *See Barajas-Nunez*, 91 F.3d at 834-35. In this case, Appellant argues that the district court, while explaining why the five-level departure requested by the government was inappropriate, did not explain why the three-level departure it ultimately imposed was appropriate. We are compelled to agree with Appellant on this issue. As we read the trial transcript, the district court's statements in support of a three-level departure[19] appear more like reasons which mitigate a five-level departure rather than explain the appropriateness of a three-level departure. Accordingly, we remand this case to the district court in order to justify the extent of the departure.

### Conclusion

In conclusion, the judgment of the district court is **AFFIRMED IN PART AND REVERSED IN PART**. We affirm Appellant's convictions as to Counts 1, 2, and 3 of the indictment. We reverse Appellant's convictions as to Counts 4 and 5 of the indictment. Since Counts 4 and 5 did not control the offense level for purposes of calculating the sentence for the grouped counts, we need not remand the case for resentencing as a result of the reversal of those convictions. In addition, we affirm the district court's decision to upwardly depart from the Sentencing Guidelines. However, this case is **REMANDED** to the district court to justify the extent of the departure.

---

[19]The court pointed to Appellant's lack of knowledge of the violent activities of the Strollo enterprise and the letters of support indicating that Appellant otherwise reduced violent street crime.

from the guideline sentence. Appellant also claims the district court erred by permitting the prosecution to conduct cross-examination regarding criminal convictions or indictments of other employees of the Mahoning County Sheriff's Department. For the reasons set forth below, we affirm Appellant's convictions on Counts 1, 2, and 3 of the indictment. We reverse Appellant's convictions on Counts 4 and 5 of the indictment. In addition, we affirm the district court's decision to upwardly depart from the guideline sentencing range but remand the case for the district court to justify the extent of the departure.

### I.

As the evidence presented in this case will be discussed in greater detail in Part II, *infra*, at this time we will only give a brief recounting of the facts in this case.

In 1992, Appellant Philip A. Chance ran for the office of Mahoning County Sheriff but lost in the primaries to incumbent Ed Nemeth.[1] Appellant did, however, garner forty percent of the votes in the primary. Buoyed by this achievement, Appellant decided to run for Sheriff again in 1996. Missing from his 1996 campaign, however, was a key ingredient of his 1992 campaign–the financial support of Youngstown mall developer Anthony Cafaro. Financially strapped and with his campaign in need of funds, Appellant turned to Youngstown Mafia boss Lenine "Lenny" Strollo for help.

Lenny Strollo was having problems of his own in 1996. Strollo was a member of the Pittsburgh branch of La Cosa Nostra. Thanks to extensive payoffs to politicians and high-ranking law enforcement officials, Strollo controlled all the illegal gambling operations in the communities and suburbs

---

[1]Appellant had been a deputy sheriff for Mahoning County from 1973 to 1987, attaining the highest rank of detective. Appellant had a number of jobs between 1987 and 1992, including working for a security agency in Youngstown and operating a fireworks store in Florida.

surrounding Youngstown. Gambling operations within Youngstown itself, however, were a different matter. Here, Strollo had two interrelated problems. One problem was that he had competition not only from independent gambling operations, but also from the Cleveland branch of La Cosa Nostra.[2] The second problem was that the police chief in Youngstown was unbuyable and Strollo's agreement with the incumbent sheriff, Ed Nemeth, had apparently run its course. Thus, Strollo had no influence within Youngstown proper. To illustrate, one of Strollo's early efforts to extort a "street tax" from the independent bookmakers for the privilege of operating in Youngstown was largely unsuccessful because of lack of cooperation from local law enforcement. Therefore, Strollo decided to back Appellant in the election for county sheriff and then use the Appellant's department to close down those gambling operations who refused to pay up.

The other principal players in this crime drama were John Chicase, Lawrence "Jeep" Garono, and Charles O'Nesti. Chicase, also a former deputy sheriff, was a close friend of Appellant's and a key member of Appellant's campaign staff. Although after leaving the Sheriff's Department Chicase ran a legitimate security business, he also participated in Strollo's criminal operations. It was Chicase, along with a collector named Tony Zappia, who carried out Strollo's initial attempt to extort a street tax from the independent gambling operations. Coincidentally and fortuitously, Jeep Garono and Chicase were first cousins. Garono owned a legitimate landscaping business, but was also one of the top lieutenants in Lenny Strollo's gambling organization. Charles O'Nesti, a long-time friend of Lenny Strollo, was an aide to U.S. Representative James Traficant and had a well-known reputation for being the mob's "bagman" in Youngstown.

---

[2]Youngstown is approximately equidistant between Cleveland and Pittsburgh, causing mafiosi from both cities to wage a bloody war for control of its criminal activities. *See Crimetown, U.S.A.*, http://abcnews.go.com/onair/Nightline/nl000330.html (visited January 14, 2002) (stating that the mob war resulted in 75 car-bombings in 12 years).

Appellant could have been held accountable, the district court appropriately took this conduct into consideration.

In light of the foregoing, it remains to be decided whether the district court erred in concluding that the enunciated factors take this case outside the heartland of bribery cases. Even though we have found that the district court improperly relied on one factor, we may still affirm the decision to depart from the Guidelines as long as the remaining reasons are sufficient to justify the departure. *Williams v. United States*, 503 U.S. 193, 204 (1992). We find that the remaining factors were sufficient to justify the district court's conclusion that an upward departure was warranted in this case. We agree with the district court that this case was not a "garden variety" bribery case. This case was far from a street cop taking money to look the other way. Rather, Appellant's acceptance of bribes from Lenny Strollo permitted a notorious criminal enterprise to control the law enforcement activities of an entire department. In effect, Appellant gave the Mafia its own police force. Therefore, we think Appellant's involvement with organized crime figures and the nature of his agreement with them is sufficient to take this case outside the heartland of bribery cases. Furthermore, Appellant's abuse of the state campaign laws in order to assume power was also an aggravating circumstance that took this case outside the heartland of bribery cases. Consequently, we find that the district court did not abuse its discretion in deciding to depart upwardly from the guideline sentencing range.

Finally, we must determine whether the amount of the departure was reasonable. After determining that the departure by the district court was not based on impermissible factors, this Court reviews any sentence that is outside the applicable guideline range for reasonableness. *United States v. Barajas-Nunez*, 91 F.3d 826, 834 (6th Cir.1996); 18 U.S.C. § 3742(e)(3). The reasonableness determination looks to the amount and extent of the departure in light of the grounds for departing. In assessing reasonableness under § 3742(f)(2), the Act directs a court of appeals to examine the factors to be considered in imposing a sentence under the Guidelines, as

in relying on the fact that Appellant was the chief law enforcement officer of the county, without further explanation, as a basis for an upward departure.

Finally, we think the district court could properly rely on the fact that Appellant violated state campaign laws in upwardly departing from the Sentencing Guidelines. Section § 1B1.4 provides:

> In determining the sentence to impose within a guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character, or conduct of the defendant, unless otherwise prohibited by law. *See* 18 U.S.C. § 3661.

Moreover, in developing an appropriate sentence, a district court may take into consideration uncharged conduct or even conduct for which the defendant has been acquitted so long as that conduct has been proven by a preponderance of the evidence. *United States v. Watts*, 519 U.S. 148, 154, 157 (1997). Therefore, in this case, the district court could properly take into account the fact that Appellant's course of conduct included violations of state campaign laws provided the government proved such conduct by a preponderance of the evidence. In this case, Appellant does not argue that he did not violate any state campaign laws, he only argues that this conduct is subsumed in the "pattern of racketeering activity." Even if these violations were part of the pattern of racketeering activity, Appellant still could have been charged, convicted, and sentenced for these individual violations. *See United States v. Licavoli*, 725 F.2d 1040, 150 (6th Cir. 1984) ("There is nothing in the RICO statutory scheme which would suggest that Congress intended to preclude separate convictions or consecutive sentences for a RICO offense and the underlying predicate crimes which make up the racketeering pattern.") (quoting *United States v. Rone*, 598 F.2d 564, 571 (9th Cir. 1979)). Because the campaign violations were separate, chargeable conduct for which

Testimony at trial showed that during the election campaign, Appellant asked Chicase to approach Jeep Garono about soliciting money on his behalf from Lenny Strollo despite Chicase's warnings that if he took money from Strollo he "would be selling his soul to the Devil." Appellant also asked O'Nesti to ask Strollo for money for his campaign. Strollo testified that initially he and Appellant met at his house several times and that Appellant understood what would be required when he took office. The understanding, of course, was that Appellant would use the Sheriff's Department to shut down the non-cooperating gambling operations identified by Strollo but leave unmolested Strollo's own operations. After the initial few face-to-face meetings, Appellant and Strollo used Chicase, Garono, and O'Nesti as go-betweens so the two would not be connected and ruin Appellant's bid to become sheriff. Testimony at trial further showed that Strollo used Garono, O'Nesti, and Chicase to funnel over $30,000 to Appellant for his campaign. In addition, Strollo paid for the cost of catering one of Appellant's fundraisers by forgiving a $12,000 gambling debt owed to him by the caterer's nephew. In addition, after the election, Strollo paid for a gambling junket to Atlantic City taken by Appellant and Chicase.

Appellant won the election and installed Chicase as the head of the vice department. According to Chicase's testimony, Garono identified two gambling operations, one on Lane Street in Youngstown and one at the Open Hearth Restaurant, which Strollo wanted the Sheriff's Department to raid. Chicase testified that Appellant gave him permission to conduct the raids with the full knowledge that the requests for the raids came from Strollo. On another occasion, O'Nesti asked Chicase to raid a barbut[3] game at an establishment

---

[3] In another case, this Court described barbut as follows:

> The gambling activity carried on at the Midway Club was a form of dice game known as "Barbut," a game in which customers bet against one another but not against the house. The proofs showed that in a Barbut game, the house does not itself gamble,

called the Greek Coffee House. It turned out, however, that this particular game was operated by Bernie Altshuler, another one of Strollo's top men. Therefore, Garono told Chicase to leave it alone. Faced with conflicting instructions, Chicase went to Appellant, who told him not to raid the game and said that he would "take care of" O'Nesti. As a result, the Sheriff's Department never raided the Greek Coffee House game.

In addition to his agreement with Lenny Strollo, Appellant had his own plan to extort campaign contributions from Youngstown fireworks millionaire Bruce Zoldan. Zoldan was a supporter of Appellant's opponent and therefore did not contribute to Appellant's campaign. Chicase testified that during the election, he and Appellant discussed shutting down Zoldan's business after taking office (presumably on bogus safety violations) in response to his lack of support. After Appellant took office, Chicase was involved in a meeting regarding transferring some prisoners from Columbiana County to Mahoning County with Zoldan's chief of security, Robert Martino. Martino testified that when that meeting broke up, Chicase pulled him aside to tell him to tell Zoldan that if Zoldan "didn't come across he was going to shut his operation down." Martino relayed the message to Zoldan and as a result, Zoldan purchased approximately $2,000 in tickets to a golf outing being held to reduce Appellant's campaign debt.[4]

---

but provides the facility and the dealers who actually handle the dice. The house takes a percentage of the winnings of each game. The minimum bet in any given game at the Midway Club was $5 on a single throw of the dice and the pot size varied greatly. The winner would pay to the house 2 and ½ percent of the amount he won, exclusive of his own bet.

*See United States v. Mattucci*, 502 F.2d 883, 887 (6th Cir. 1974).

[4]Zoldan was a long-time victim of extortion. In the early 1990's, Zoldan drew the ire of a Philadelphia mobster named Billy D'Elia for selling fireworks in the New York City area without D'Elia's permission. D'Elia demanded Zoldan pay him $300,000 as a penalty. Eventually,

---

enforcement officer." In addition, Appellant was an "elected official." We think the combination of those two elements encompasses the district court's rationale that Appellant was the chief law enforcement officer in the county and therefore is taken into consideration by the Guidelines.

Moreover, we disagree with the government that the district court upwardly departed pursuant to Application Note 5 of § 2C1.1. While the district judge did say that she agreed with the government that the case did not involve "garden variety bribery," there was no finding that the corruption was pervasive or systemic or could cause a loss of public confidence. The cases cited to us by the government in support of its position are distinguishable for one reason or another.[18] Therefore, we conclude that the district court erred

---

[18]In *United States v. Hart*, 70 F.3d 854 (6th Cir. 1995), the district court, while not citing Application Note 5, stated that the consequences of the defendant's embezzlement "are so cruel and hurtful to the residents of this community that they alone warrant an upward departure in the sentence." *Id.* at 862. We think this statement is the equivalent of finding a loss of public confidence in the government. In *United States v. Shenberg*, 89 F.3d 1461 (11th Cir. 1996), the district court specifically found that the defendant's conduct "undermin[ed] the system of justice in Dade County and in this country." *Id.* at 1476. Similarly, in *United States v. Hatch*, 926 F.2d 387 (5th Cir. 1991), the district court specifically found that the defendant's conduct "resulted in irreparable harm to public confidence in law enforcement." *Id.* at 398. In *United States v. Bustamante*, 45 F.3d 933 (5th Cir. 1995), the district court imposed a two-level enhancement for abuse of a position of public trust pursuant to § 3B1.3 but specifically did not consider the applicability of § 2C1.1 because the base offense level was determined under § 2E1.1(a). *Id.* at 947 & 947 n.9. In *United States v. Reeves*, 892 F.2d 1223 (5th Cir. 1990), the Court, in addressing § 2C1.1, stated that "[w]e find nothing objectionable in a determination that certain office holders charged with certain responsibilities warrant a departure from the guidelines." *Id.* at 1229. The Court concluded, however, that the upward departure was justified solely under Application Note 4 because the monetary value of the bribe was unknown and did not adequately reflect the seriousness of the offense. *Id.* Thus, the Court's initial statement endorsing the government's position is not only dicta, but conflicts with our own analysis that § 2C1.1(b)(2)(B) already takes into consideration Appellant's position.

We think that Appellant's first argument, that the RICO sentencing guideline, U.S.S.G. § 2E1.1, already takes into consideration the fact that the offense will often involve organized crime, has some superficial appeal. After all, Congress' purpose in enacting the RICO statutes was to eradicate organized crime. *See Russello v. United States*, 464 U.S. 16, 27 (1983). Thus by sheer force of reason it would seem that the Sentencing Commission must have considered this factor in developing an appropriate sentencing guideline for RICO offenses. *But see United States v. Rainone*, 32 F.3d 1203, 1209 (7th Cir. 1994) (holding that upward departure based on involvement with organized crime was appropriate because application of RICO is not limited to "organized crime" and noting that "run of the mill criminal activities. . . are the routine grist of RICO prosecutions."). We note, however, that even though Appellant was convicted of a RICO offense, pursuant to § 2E1.1(a)(2), the sentencing court applied the guideline for the predicate act of bribery, § 2C1.1, because it provided the greater total offense level. Even if we assume that § 2E1.1 already takes involvement in organized crime into consideration, § 2C1.1, the guideline ultimately applied by the sentencing court, does not. Therefore, we think that the district court could appropriately consider the fact that Appellant took bribes from organized crime figures in determining whether to upwardly depart from the guideline range.

We do, however, agree with Appellant that the eight-level enhancement under § 2C1.1(b)(2)(B) took into consideration the fact that Appellant was the highest law enforcement official in the county. In this case, the district court stated that the Sentencing Guidelines "do not take into consideration the fact that [Appellant] was the chief law enforcement officer for the county." For purposes of this section, Application Note 1 to § 2C1.1 states that "'Official holding a high-level decision-making or sensitive position' includes, for example, prosecuting attorneys, judges, agency administrators, supervisory law enforcement officers, and other governmental officials with similar levels of responsibility." As the sheriff of the county, Appellant clearly was a "supervisory law

On February 2, 1999, a grand jury for the Northern District of Ohio returned a six-count indictment against Appellant and John Chicase. Appellant was charged in five of those six counts. Chicase later entered into a plea agreement with the government and testified against Appellant at trial. Count 1 of the indictment charged Appellant with conducting the affairs of an enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). As predicate acts of the RICO charge, the indictment alleged three separate acts of bribery in violation of Ohio Revised Code § 2921.02, two separate acts of extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, and one act of obstruction of local law enforcement in violation of 18 U.S.C. § 1511. Count 2 charged Appellant with conspiracy to commit a RICO violation under 18 U.S.C. § 1962(d). Counts 3 and 4 of the indictment were substantive Hobbs Act charges for conspiring to extort campaign contributions from Bruce Zoldan and conspiring to extort a street tax from independent gambling operations. Count 5 of the indictment was the substantive charge for obstruction of local law enforcement in violation of 18 U.S.C. § 1511.

The case proceeded to a ten-day trial beginning on June 28, 1999. During trial and over Appellant's objections, the district court permitted the prosecution to cross-examine Appellant concerning the criminal indictments of other deputies working under Appellant on the Sheriff's Department. The trial court also denied Appellant's Rule 29 motions for judgment of acquittal at the close of the government's case-in-chief and at the close of evidence. On

---

Strollo acted as a mediator and negotiated the demand down to $100,000, which Zoldan paid. Thereafter, Zoldan paid Strollo protection money of $25,000 per year. In addition to mob extortion, Zoldan testified that in 1983, then-Sheriff James Traficant closed down his fireworks operation on July 3rd at the behest of a competing operation. Appellant, as a deputy, led the raid that day. Zoldan sued the county on various constitutional violations and received a "large sum of money" from the county to settle the case.

July 13, 1999, the jury returned verdicts convicting Appellant on all counts.

The district court held a sentencing hearing on November 24, 1999. For purposes of sentencing, Appellant's convictions were grouped pursuant to U.S.S.G. § 3D1.2. The district court then used the guideline for bribery, U.S.S.G. § 2C1.1, because pursuant to the RICO guideline, U.S.S.G. § 2E1.1, it provided the highest offense level. The bribery guideline established a base offense level of ten. The district court then added 2 levels because the offense involved more than one bribe and 8 levels because the offense involved payments for the purpose of influencing an elected official or an official holding a high-level decision-making position. The subtotal from § 2C1.1 was 20. Over Appellant's objections, the district court then added a 2 level enhancement under § 3C1.1 for obstruction of justice on the grounds that Appellant committed perjury during trial. Thus, those calculations combined with a criminal history category of I provided a guideline sentencing range of 41 to 51 months of imprisonment. The trial judge, however, found that Appellant's case was "outside the heartland" of bribery cases and, therefore, again over Appellant's objections, upwardly departed three levels to a final offense level of 25. A final offense level of 25 produced a sentencing range of 57 to 71 months of imprisonment. The district court then sentenced Appellant to 71 months of imprisonment, two years of supervised release, 100 hours of community service, and a $500 special assessment.

Appellant now appeals from the judgment of the district court. Specifically, Appellant challenges the sufficiency of the evidence supporting the convictions, the district court's decision regarding the proper scope of cross-examination, the district court's decision to impose a two-level enhancement for obstruction of justice, and the district court's decision to upwardly depart from the guideline sentencing range. We take up these issues seriatim.

that Appellant had otherwise reduced violent street crime in Mahoning County. *See id.* at 812-15.

Appellant argues that the district court erred in departing based on the stated factors because: 1) with respect to the factor of taking bribes from a member of organized crime, in establishing the appropriate offense level for RICO violations the Sentencing Commission has already taken into consideration that RICO offenses will often involved organized crime; 2) the applicable sentencing guideline, § 2C1.1(b)(2)(B), already took into consideration the fact that Appellant was the highest county law enforcement official by imposing an eight-level enhancement for being an elected official or an official holding a high-level decision-making position; and 3) the fact that Appellant abused and/or violated the election laws was merely a finding that Appellant engaged in "a pattern of racketeering activity" and that the RICO guidelines also take this factor into consideration. In opposition, the government essentially argues that the sentencing court adopted the position the government took in its sentencing memorandum that an upward departure was appropriate pursuant to Application Note 5 of § 2C1.1 because Appellant's offense may cause loss of public confidence in government.[17] In support of its position the government cites a number of cases upholding upward departures in RICO cases on the grounds of loss of public confidence. Appellant notes in his reply brief, however, that the district court never made a finding that the offense involved systematic or pervasive corruption or that the offense might cause a loss of public confidence.

---

[17]Application Note 5 provides:

Where the court finds that the defendant's conduct was part of a systematic or pervasive corruption of a governmental function, process, or office that may cause loss of public confidence in government, an upward departure may be warranted

U.S.S.G. § 2C1.1, Application Note 5.

1078 (6th Cir. 2001).   Where, as in this case, the sentencing court provides multiple reasons for an upward departure, this Court will affirm if it is satisfied that any one of the factors would justify the departure.  *United States v. Hart*, 70 F.3d 854, 862 (6th Cir. 1995).

In upwardly departing from the Guidelines sentencing range in this case, the district court stated:

> Some adjustment is clearly appropriate in this case.  A departure from the guidelines is appropriate.  While it is true that the guidelines do take into consideration the fact the defendant is a public official in the initial calculations, they do not take into account the fact that he was the chief law enforcement official of the county.

> They also do not take into account that, as Mr. Morford said, this is not a garden variety bribery in which someone takes a small amount of money from someone on the street, but where someone takes money from an individual they know to be involved with organized crime, and then, in turn, aids that individual in furthering at least some portion of their business.

> The guidelines also could not possibly take into account the extent to which this defendant, though the chief law enforcement of the county, ignored the ways the law was supposed to apply to him in terms of how he was permitted to raise money, how he was permitted to run for office, and how he was permitted to conduct himself during the course of that process.

> All of those factors mean that some upward adjustment is appropriate.

Jt. Appx. at 812.   The district court then rejected the government's request for a five-level departure and instead departed only three levels because, as near as we can discern, there was no evidence that Appellant was aware of or assisted in the violent activities of the Strollo enterprise and because members of the community sent letters of support indicating

## II.

### A. *Sufficiency of the Evidence*

As noted, Appellant challenges the sufficiency of the evidence supporting his convictions.  In particular, Appellant argues that the evidence failed to establish that: 1) the RICO enterprise described in the indictment had an existence apart from the alleged pattern of racketeering activity; 2) the activities of the alleged RICO enterprise had a cognizable effect on interstate commerce; 3) the alleged Hobbs Act extortions had a cognizable effect on interstate commerce; 4) Appellant had any culpable involvement in a conspiracy to commit extortion under the Hobbs Act; and 5) there was an "illegal gambling business" as defined in 18 U.S.C. § 1511.  This Court reviews the sufficiency of the evidence supporting a criminal conviction "by determining whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Wang*, 222 F.3d 234, 237 (6th Cir. 2000) (internal quotation marks omitted).  Before reviewing the sufficiency of the evidence, however, we must determine whether Appellant has preserved these issues for appeal.  The government argues that Appellant failed to preserve these challenges to the sufficiency of the evidence by failing to raise them in motions for judgment of acquittal made under Rule 29 of the Federal Rules of Criminal Procedure[5] at the end of the prosecution's case-in-chief and at the close of evidence.

---

[5]Rule 29 of the Federal Rules of Criminal Procedure provides in pertinent part:

> The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Fed. R. Crim. P. 29(a).

This Court will not consider challenges to the sufficiency of the evidence if the defendant failed to make a Rule 29 motion for judgment of acquittal at the end of the prosecution's case-in-chief and at the close of the evidence. *United States v. Dandy*, 998 F.2d 1344, 1356 (6th Cir. 1993). Failure to make the required motions constitutes a waiver of objections to the sufficiency of the evidence. *Id.* Although specificity in a Rule 29 motion is not required, where the defendant makes a Rule 29 motion on specific grounds, all grounds not specified in the motion are waived. *Id.* at 1356-57. In this case, since the record is clear that Appellant did make Rule 29 motions at the appropriate time, the issue is whether, as the government contends, Appellant's Rule 29 motions were based on specific grounds which did not include the claims of insufficiency now asserted. In opposition, Appellant argues that his Rule 29 motions were based on general grounds and that trial counsel merely highlighted specific areas of alleged insufficiency only as examples. In fact, Appellant argues, the record demonstrates that the trial judge understood that his motions were general in nature and could potentially be challenges to each element of the offense charged in each count of the indictment.

The record reflects the following discussion on Appellant's Rule 29 motion at the end of the government's case-in-chief:

Mr. Yelsky [Appellant's trial counsel]: I agree. But at any rate, just to make the record complete, I would still make a Rule 29 motion. Particularly, I find no evidence that anyone said that Phil Chance helped extort Zoldan, as an example. And also, the only documentary evidence about any money offered by the government turned out to be a complete fabrication by Mr. O'Nesti, and that he testified very explicitly that he carried 5,000 dollars of cash that was given by Mr. Strollo to him, and that he very explicitly stated that he put this $5,000 cash into his bank account, and he showed us his bank account.

What it really turned out to be was a complete fraud.

four-step process requiring the sentencing court to ask and answer the following questions:

1) What features of this case, potentially, take it outside the Guidelines' "heartland'" and make of it a special, or unusual, case?

2) Has the Commission forbidden departures based on those features?

3) If not, has the Commission encouraged departures based on those features?

4) If not, has the Commission discouraged departures based on those features?

*Koon v. United States*, 518 U.S. 81, 95 (1996). If the special factor of the case is a forbidden factor, the sentencing court cannot use it as a ground for departure. If the special factor is an encouraged factor, the sentencing court may depart if the applicable Guideline does not already take the factor into consideration. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the Guidelines, the sentencing court should depart only if the factor is present to a degree that makes the case different from the ordinary case where the factor is present. *Id.* at 95-96. If the factor is not mentioned by the Guidelines, the sentencing court must, "after considering the structure and theory of both the relevant individual guidelines and the Guidelines as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland." *Id.* at 96.

We review a district court's decision to depart from the Guidelines sentencing range for abuse of discretion. *United States v. Barber*, 200 F.3d 908, 911 (6th Cir. 2000). A district court has abused its discretion if the appellate court is left with a definite and firm conviction that the court below committed a clear error of judgment. *United States v. Guy*, 978 F.2d 934, 939 (6th Cir. 1992). Whether a stated ground is a permissible basis for departure is a question of law we review de novo. *United States v. Sabino*, 274 F.3d 1053,

convictions, those decisions were based on jurisdictional grounds, i.e., the failure to prove a nexus with interstate commerce and the failure to prove the requisite illegal gambling business. We have no doubt that the record amply demonstrates that Appellant did in fact engage in acts of extortion and obstruction as those counts allege. Thus, because as we have stated establishing Appellant's relationship with Lenny Strollo was the lynch pin to the government's entire case against Appellant, we agree with the district court that Appellant's testimony was materially false and was intended to have a material impact on the prosecution of the case.

Accordingly, we find Appellant's challenge to the district judge's decision to impose a two-level sentencing enhancement for obstruction of justice to be without merit.

### 2. *Upward Departure from the Guideline Sentencing Range*

The final issue is whether the district court erred in upwardly departing from the Guideline Sentencing range. The district court found that an upward departure of three levels was appropriate because the Sentencing Guidelines did not take into consideration the facts that Appellant was the chief law enforcement officer for the county, the bribery offenses involved members of organized crime, and Appellant violated the state election laws in running for office.

The Sentencing Guidelines provide:

[T]he sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

U.S.S.G. § 5K2.0 (internal quotation marks omitted). Appropriately departing from the Sentencing Guidelines is a

The Court: That goes to the credibility of that witness, and credibility is a determination that the jury has to make.

Mr. Yelsky: I understand all that. I have to make my motion.

The Court: The witness firmly testified under oath that he transferred those funds. Whether the jury ultimately believes him or not is for them to conclude.

Mr. Yelsky: I have to make my motion, Judge.

The Court: I understand. I actually went through the indictment this morning and assessed each of the elements in anticipation of a Rule 29 motion, and I think that you are probably correct that one of the weakest places in the government's case is the reference to the extortion of Mr. Zoldan, but to the extent that John Chicase can be characterized as an agent for Mr. Chance with respect to those statements, there is testimony from Mr. Chicase and testimony from Mr. Strollo and testimony from Mr. Zoldan that those statements, threatening statements were made, and that they were passed on to Mr. Zoldan.

Mr. Morford [AUSA]: And Mr. Martino and Mr. O'Nesti.

Mr. Yelsky: Idle chatter.

The Court: The real issue will be whether or not the jury ultimately concludes that Mr. Chance directed or even requested or adopted those statements.

Mr. Yelsky: But in response, I'd like to say that Mr. Chance, that Mr. Zoldan himself testified that when a former sheriff closed him down he sued the county and won a considerable sum of money, and that Phil Chance under the directions of a former sheriff by the name of Traficant apologized to him for doing this, that he knew

it was wrong. That's coming right out of the mouth of one of the witnesses that's quoting what Phil Chance said.

Mr. Morford: Knew what was wrong?

The Court: I'm not sure that's an exact characterization.

Mr. Morford: Even if it was, even if that's–he [Appellant] knew what was going on, he knew it was wrong to go in and conduct the raid and he did it anyway[.] Okay?

Mr. Yelsky: He did it under instructions. He apologized.

The Court: That same witness also said that Mr. Chance said, you know, "I know it's wrong, but I also sympathize with why we're doing it."

The jury can take all that into consideration. I think the government has established enough evidence to go to the jury on each of its claims. I think that with respect to the RICO there is stronger evidence with respect to certain of the alleged predicate acts, but all the jury needs to conclude unanimously is that at least two of these predicate acts occurred, but there is certainly enough on each of the claims to go to the jury.

I think some claims, the evidence on some is probably weaker than on others, but that's not a conclusion for me to determine. I only need to determine as to whether each element of each of the offenses the government has established proof, and with the direct testimony of the witnesses, all of whom you can argue as to their credibility, but with their direct testimony of sworn testimony of witnesses and the admissible out-of-court statements, as well as the admissible admissions attributed to Mr. Chance himself, there is certainly enough for the jury to consider each of the charges against the defendant.

of identifying the particular portions of Appellant's testimony she found to be perjurious.

Furthermore, we agree with the district court that Appellant's testimony in the areas identified was untruthful and material to the case. The three areas of testimony identified by the district court are related and material, because without proof of a relationship between Lenny Strollo and Appellant, there is no factual predicate for finding that Appellant took bribes from Strollo or agreed to protect Strollo's gambling operations while raiding those of his competitors. The government's entire prosecution was based on proving Appellant's relationship with Strollo. Thus, while Appellant admitted only to an inconsequential five minute meeting with Strollo and denied taking any payments from Strollo, Strollo testified that he met with Appellant several times in his house, gave Appellant campaign advice, and personally handed Appellant $10,000. Strollo further testified that he and Appellant had an understanding about what would be required if Appellant won the election. John Chicase testified that Appellant asked him to approach Lenny Strollo for money, was aware of and approved the plan to extort a street tax from independent bookmakers, and knowingly approved raids on gambling establishments identified by Jeep Garono. Charles O'Nesti also testified that Appellant asked him on numerous occasions to approach Lenny Strollo for money and that on two occasions he delivered to Appellant a package of money from Strollo. *See* Jt. Appx. at 176-77.

Furthermore, contrary to Appellant's assertions, the evidence on these issues did not simply involve a swearing contest between Appellant and the government's immunized witnesses. Most of the details of Strollo's, Garono's, Chicase's, and O'Nesti's testimony is corroborated by the contemporaneous FBI surveillance tapes. For instance, one transcript reflects Strollo's and O'Nesti's irritation that Appellant kept asking for more money. *See* Jt. Appx. at 686. Another transcript corroborates Appellant's intention to extort Bruce Zoldan for campaign contributions. *See id.* at 731. While in this order we have reversed two of Appellant's

have had a material impact on and was intended to have a material impact on this prosecution.

So for all of those reasons, I conclude that a two-level adjustment for obstruction of justice is appropriate in this case, and I'm going to apply it.

Jt. Appx. at 798-800. We do observe that in its sentencing memorandum, the government identified with great specificity Appellant's statements which it believed to be materially false. *See id.* at 755-66. However, we find no clear indication on this record that the district court independently adopted the government's version of the alleged perjurious statements. Therefore, our review is limited to determining whether the findings just quoted were sufficient to support a finding for obstruction of justice based on perjury. Nonetheless, despite this limitation on the scope of our review, we find that the district fulfilled the requirements necessary for an obstruction of justice enhancement.

As an initial matter, we find that the district court satisfied the requirement of identifying particular areas of Appellant's testimony she deemed to be perjurious. Specifically, the district judge found that Appellant perjured himself with regard to: 1) denying having any relationship with Lenny Strollo; 2) taking money from Lenny Strollo and Jeep Garono; and 3) selectively enforcing the gambling laws in favor of Lenny Strollo. In addition, the district court appeared to make a finding that Appellant's testimony was pervasively perjurious, stating that Appellant "denied virtually every single fact that other witnesses testified to . . .despite substantial evidence to the contrary." Jt. Appx. at 799; *see also id.* ("[T]he defendant lied about so many things under oath that he even got to the point about lying about immaterial things."). Since the sentencing judge is not required to rigidly adhere to the procedures set forth in *Sassanelli*, *see Sassanelli*, 118 F.3d at 501, we believe that the district court, in identifying the specific subject matter about which Appellant was untruthful, sufficiently carried out its burden

So your Rule 29 motion is denied.

Jt. Appx. 417-20.

At the close of evidence, the following discussion on Appellant's re-newed Rule 29 motion took place:

Mr. Yelsky: One last thing, Your Honor. I would like to renew our Rule 29 motion to make the record complete, and also I would like to ask that the Court specifically re-examine the Zoldan count of extortion.

Other than that, that's what we have at this point.

The Court: Re-examine the Zoldan count because you think there has not been–

Mr. Yelsky: Proof sufficient to go to the jury on that point.

The Court: I'm going to deny the motion. I do think that the Zoldan count, because they don't have any witnesses other than John Chicase that testified, that that information came directly from Phil Chance.

Mr. Morford: And Chuck O'Nesti.

The Court: Well, I thought Chuck O'Nesti testified that it came from John Chicase. In other words, you have Chuck O'Nesti, you have what's his name, Marino [sic].

Mr. Morford: Right.

The Court: Both of whom say that John Chicase–

Mr. Morford: O'Nesti actually even says right on the tape, Phil Chance told me that he's going to shut him down for the 4th of July, and he said that's what Phil Chance had told him.

The Court: Okay. In any event, I think there is a strong argument you can make to the jury that it hasn't been

established by proof beyond a reasonable doubt, but I think that with the testimony of John Chicase, Chuck O'Nesti, and Mr. Martino and Mr. Zoldan himself that there is enough to go to the jury on that question.

So I'm going to deny the Rule 29 motions and send the issues to the jury.

Jt. Appx. at 543-44.

We think that Appellant is correct when he argues that his Rule 29 motions were general in nature and that the trial court understood the motions to be general. While it is true that the much of the colloquy on the motions centered around specific areas of evidence, particularly whether Appellant made threatening statements to Mr. Zoldan, it is clear that the trial court's rulings on the motions were not addressed to the extortion charge only. For instance, during the first colloquy, the trial judge stated that she "went through the indictment" and "assessed *each element* in anticipation of a Rule 29 motion." *See* Jt. Appx. at 418 (emphasis added). In addition, the trial judge stated on three separate occasions that the government had adduced sufficient evidence on each of the charges to present the case to the jury. *See id.* at 420 ("I think the government has established enough evidence to go the jury *on each of its claims*." "[T]here certainly is enough on *each of the claims* to go the jury." "There is certainly enough for the jury to consider *each of the charges* against the defendant.") (emphasis added). We find that even though most of the discussion centered on one alleged flaw in the evidence on one particular charge, trial counsel did not intend and the trial judge did not interpret Appellant's Rule 29 motion to be limited to just that one charge. Fairly read, the trial judge's statements indicate that she considered the Rule 29 motion with respect to all of the charges against Appellant. Furthermore, at the close of evidence, we believe that trial counsel adequately renewed and incorporated by reference the first Rule 29 motion, even though again some discussion centered on the adequacy of the evidence supporting the charge for extorting Mr. Zoldan. We find, however, that the

of, the Court can easily conclude that the defendant did, in fact, commit perjury on the stand.

The defendant, as Mr. Morford states, took the stand and denied just not his guilt or innocence, but denied virtually every single fact that other witnesses testified to. He denied any relationship with Mr. Strollo. He denied ever taking any money from Mr. Strollo or through Mr. Garono. He denied the activities of the sheriff's office with respect to raiding or not raiding certain institutions in a way that would benefit Mr. Strollo.

And he denied all of these things despite substantial evidence to the contrary. Indeed, in reviewing the defendant's testimony to refresh the Court's recollection of the scope of the testimony, it was clear that the defendant lied about so many things under oath that he even got to the point about lying about immaterial things. And while the Court cannot rely on the jury's determination, it's obvious from the fact that the defendant took the stand and said that everyone who testified had been untruthful and that he had not engaged in any of this conduct, that the jury disbelieved all of his testimony when it concluded that he was guilty with respect to every single one of the counts in the indictment.

And again, while the jury can–while the Court cannot rely on the jury's determination and must make its own independent determination, again, I simply note that my determination is consistent with that reached by the jury.

I've had the opportunity to view the defendant while testifying. I've had the opportunity to rereview his testimony. And in all the ways that I've already noted, as well as in connection with his description of where he received money for his campaign and in his attempted justification for how he described that money on his campaign finance records and otherwise, in all of those ways the defendant testified under oath in a way that was materially false and would have, if believed by the jury,

specific findings as to each element of perjury or make a finding that "encompasses all of the factual predicates for a finding of perjury." *Id.* With respect to the first requirement, identifying with particularity perjurious testimony, the Sixth Circuit has "never insisted on rigid adherence to its terms, so long as the record below is sufficient to indicate those statements that the district court considered to be perjurious and that the district court found that those statements satisfied each element of perjury." *Sassanelli*, 118 F.3d at 501. The district court may rely on a detailed list of alleged perjurious statements proffered by the government at sentencing without repeating the list if the record clearly indicates that the trial court has independently adopted the government's version. *Id.* Where the testimony appears to be "pervasively perjurious" the trial court is not required to cite the perjury line-by-line if its findings encompass the factual predicates for finding perjury. *Id.* If, however, there is no indication in the record as to the statements the district court considered to be untruthful, the sentence must be reversed. *Id.* We are not permitted to review the record independently to make our own findings and then infer that the district court had the same statements in mind. *Id.* Contrary to Appellant's assertion, we find nothing in the case law which requires the sentencing court to give the defendant prior notice as to the testimony the district court believes might be perjurious so long as the presentence investigation report indicates, as it did in this case, that an obstruction enhancement might be appropriate because of perjury.

In this case, in finding that an obstruction enhancement was applicable, the district court stated:

> The Court has little trouble in concluding that a two-level enhancement for obstruction of justice is appropriate in this case. This is not a situation in which a defendant is being punished for exercising his constitutional right to go to trial or constitutional right to testify.
>
> It's a situation in which having listened to the testimony, having reviewed the testimony, which I have a transcript

discussion on this issue was simply too abbreviated to be construed as a Rule 29 motion based on specific grounds and that it would be unreasonable to interpret this colloquy as a waiver of further challenges to the sufficiency of the evidence. Accordingly, we find that Appellant preserved for appeal his challenges to the sufficiency of the evidence.

We now turn to the merits of Appellant's challenges to the sufficiency of the evidence.

### 1. *RICO Enterprise*

Count 1 of the indictment charged Appellant with conducting the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).[6] RICO defines an "enterprise" as "any individual, corporation, association, or other legal entity and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Under RICO, an "enterprise" may play a different role depending on the subsection implicated. *See National Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 258 (1994). Under subsections (a) and (b), the "enterprise" is something acquired through illegal activities or by money obtained through illegal activities. *Id.* at 259. For purposes of subsection (c), however, the "enterprise" is the instrument through which illegal activity is conducted. *Id.* In order to establish the existence of an "enterprise" under subsection (c), the government was required to prove: 1) an ongoing organization with some sort of framework or superstructure for making and carrying out decisions; 2) that the members of the enterprise functioned as a continuing unit with established

---

[6]This section provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

duties; and 3) that the enterprise was separate and distinct from the pattern of racketeering activity in which it engaged. *Frank v. D'Ambrosi*, 4 F.3d 1378, 1386 (6th Cir. 1993). In this case, Appellant argues that the government failed to prove that the alleged enterprise was separate and distinct from the pattern of racketeering activity. We disagree.

The indictment alleged an enterprise consisting of Appellant, John Chicase, Lenny Strollo, Bernie Altshuler, Jeep Garono, Charles O'Nesti, and other unspecified members of the Pittsburgh branch of La Cosa Nostra. The purpose of the enterprise, the indictment alleged, was to control criminal activity in Mahoning County on behalf of the Pittsburgh family, and to preserve and enrich the Pittsburgh family's power and profits. The indictment further described each participant's role in the enterprise: Lenny Strollo was the boss of the enterprise and directed its affairs. Bernie Altshuler, Jeep Garono, Charles O'Nesti, and John Chicase were liaisons or go-betweens between Appellant and Strollo, and Appellant was to enforce the laws in a manner which furthered the purposes of the enterprise. We believe that the indictment describes an enterprise which is separate from the pattern of racketeering activity and that the government proved the existence of this enterprise at trial.

First, we find there was evidence to firmly establish that Lenny Strollo was the leader of the enterprise. Strollo testified that by the time the 1996 elections approached he essentially had had a falling out with the incumbent sheriff, Ed Nemeth, in that Nemeth no longer felt obligated to work with Strollo to shut down competing independent gambling operations. Therefore, Strollo testified while he facially supported Nemeth's campaign in order to hedge his bets, he devoted the majority of his support to Appellant. Strollo met with Appellant several times during the primary campaign and personally gave Appellant at least $10,000. In exchange for his financial support, Strollo testified that Appellant understood that, among other things, he would be required to work with Strollo to enforce and collect the street tax among the independent gambling operations. In order to accomplish

district court has determined that the defendant has obstructed justice, the application of the two level enhancement is mandatory and we review the enhancement de novo. *Id.*

In this case, the district judge found that an obstruction of justice enhancement was appropriate because she found that Appellant committed perjury on the stand. The district court may not rely solely on the jury's verdict in applying an obstruction enhancement for perjury. *United States v. Sassanelli*, 118 F.3d 495, 500 (6th Cir. 1997). Rather, in order to impose an obstruction of justice enhancement for perjury, the trial court must find that the defendant committed perjury within the meaning of 18 U.S.C. § 1621, that is, that the defendant testified falsely "concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan,* 507 U.S. 87, 94 (1993), *abrogated on other grounds, United States v. Wells*, 519 U.S. 482 (1997). The district court is required to "review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same under the perjury definition [the Court has] set out." *Id.* at 95. While "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding," a determination that an enhancement is required is sufficient if "the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury." *Id.* Thus, in *Dunnigan*, the district court's finding of perjury was sufficient where it stated that "*the defendant was untruthful at trial with respect to material matters* in this case" and that the untruthful testimony on material matters "*was designed to substantially affect the outcome of the case." Id.* (emphasis in original).

The Sixth Circuit interprets *Dunnigan* to impose two requirements on the district court in imposing an obstruction of justice enhancement based on perjury. First, the court must identify the particular portions of the defendant's testimony it considers to be perjurious. *United States v. Mise*, 240 F.3d 527, 531 (6th Cir. 2001). Second, the court must make

C. *Sentencing Issues*

Appellant next challenges the district court's decisions to impose a two-level enhancement for obstruction of justice and to upwardly depart from the guideline sentencing range. We take up these issues seriatim.

1. *Obstruction of Justice Enhancement*

In calculating Appellant's offense level, the trial judge imposed a two-level enhancement for obstruction of justice pursuant to Section 3C1.1 of the United States Sentencing Guidelines[16] on the grounds that Appellant committed perjury during trial. Appellant claims that the trial judge erred in applying a sentencing enhancement for obstruction of justice based on perjury because she did not identify any particular answers to any particular questions which were materially false. Furthermore, Appellant argues, the trial judge erred by failing to give specific notice of the portions of the trial transcript she relied upon in reaching her conclusions.

Review of a district judge's decision to impose an obstruction of justice enhancement pursuant to § 3C1.1 is a three-step process. First, we review the district court's finding of facts underlying the enhancement for clear error. *United States v. Middleton*, 246 F.3d 825, 846 (6th Cir. 2001). Next, the district court's conclusion that a given set of facts constitutes obstruction of justice is a mixed question of law and fact which we review de novo. *Id.* Finally, once the

---

[16]This section provides:

If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.

this goal, Strollo and Chance agreed that Chance would appoint Chicase to lead the vice department. As further evidence of Strollo's control over Chance, Strollo testified that he instructed Chance not to accept any campaign contributions from the rival Center Street mob because they would try to control him or otherwise weaken Strollo's influence over him. Strollo also testified that he used Chuck O'Nesti and Jeep Garono as intermediaries to communicate with Appellant and that on one occasion he dealt directly with John Chicase. Jt. Appx. at 274-75. On two occasions, Strollo asked Garono to ask Chicase to shut down two independent gambling operations, one on Lane Street and one at the Open Hearth Restaurant. *Id.* at 279-80. Chicase confirmed that Garono asked him to shut down both operations and that he received authorization from Appellant to conduct raids and that Appellant was aware that the request came from Garono. *Id.* at 381-84. On another occasion, O'Nesti asked Chicase to shut down the gambling operation at the Greek Coffee House, but that Garono ordered him to leave it alone because it was Bernie Altshuler's operation. When Chicase told Appellant of the conflicting requests, Appellant told Chicase that he would take of O'Nesti. *Id.* In fact, the Sheriff's Department did not close down the Greek Coffee House game. *Id.*

In addition to orders flowing downward from Strollo through Garono or O'Nesti to Chicase to Appellant, the evidence showed that the lines of communication flowed the other way. Chicase testified that when Appellant's campaign needed cash, Appellant instructed Chicase to approach Garono to ask Strollo for money. *Id.* at 352. Appellant also approached O'Nesti to ask Strollo for money. *Id.* at 354. Furthermore, Appellant was aware that Chicase solicited money from Strollo through Garono and O'Nesti to pay for gambling junkets to Atlantic City. *Id.* at 379-80. Appellant also asked Chicase to ask Garono for the name of a lawyer Appellant could consult about suing his campaign opponent. *Id.* at 366-67.

In short, we find that the evidence showed that the enterprise involved in this case had a very clearly defined

structure which was separate from the pattern of racketeering activity. The group was structured to minimize the likelihood that anyone would discover that Appellant was connected to Lenny Strollo. Strollo designated the gambling operations he wanted shut down and passed those instructions to Garono. Garono then identified the operations for Chicase. Chicase then received approval from Appellant to conduct raids on the operations. Appellant also took orders from Strollo on accepting campaign contributions. Conversely, when Appellant needed assistance, whether it be financial assistance or otherwise, he used Chicase to approach Strollo through Garono or Appellant would approach Strollo himself through O'Nesti. Strollo then sent money to Appellant through O'Nesti or Garono to Chicase. When there were conflicting instructions, Appellant became personally involved in resolving the dispute. This was no ad hoc association of criminals.

Accordingly, we find that Appellant's challenge to the sufficiency of the evidence regarding the RICO enterprise alleged in the indictment is without merit.

### 2. *Effect on Interstate Commerce*

Appellant next contends that the evidence was insufficient to support a finding that the RICO enterprise and the alleged Hobbs Act extortions had an effect on interstate commerce. As identified by Appellant, the racketeering activities were: 1) the campaign contributions from Lenny Strollo which the jury found to be a bribe; 2) solicitation of expense money to travel to Atlantic City; 3) a conspiracy to extort a "few thousand dollars" from Bruce Zoldan by threatening to shut down his fireworks business, which Appellant argues was only a threat to the individual, not the business; 4) a conspiracy to extort a few thousand dollars apiece from local bookmakers; and 5) and the obstruction of justice charge related to gambling activities at the Greek Coffee House. According to Appellant, none of the racketeering activities alleged in the indictment and found to have been proved by

instruction was minimal. The government's inquiry was limited to two specific instances of conduct by other deputies that were unrelated to the crimes charged in the indictment. Moreover, as the government points out in its brief, the prosecutor did not exploit this testimony by re-emphasizing it during closing argument. Although we have reversed two of the counts on which Appellant was convicted, we believe it is more likely than not that the jury would have reached the same verdicts on the other charges, on which we have held the evidence was sufficient to support the convictions, even in the absence of the challenged testimony. Therefore, we think any error, if indeed the trial court did err, was harmless. *See United States v. Martin*, 897 F.2d 1368, 1372 (6th Cir. 1990) ("Where an error is not of constitutional dimensions, it is harmless unless it is more probable than not that the error materially affected verdict.").[15]

Accordingly, in summary, we find this assignment of error to be without merit.

---

[15] Regarding errors of constitutional dimension versus errors of non-constitutional dimension, the Ninth Circuit explained:

Traditionally, the courts have viewed as "constitutional errors" those errors violating specific provisions of the Bill of Rights such as the self-incrimination clause, the confrontation clause, and the exclusionary rule based on the Fourth Amendment prohibition against unreasonable searches. Errors in such matters as jury instructions, rulings on the admissibility of evidence where Fourth Amendment claims are not involved, and comments by counsel generally have been considered "nonconstitutional."

*United States v. Valle-Valdez,* 554 F.2d 911, 916 (9th Cir.1977) (internal citations omitted). Since here the claim of error involved instructions to the jury and a ruling on the admissibility of evidence not involving the Fourth Amendment, the alleged error was of non-constitutional dimensions.

introduction of the evidence or during final instructions. *See, e.g., United States v. Dabish*, 708 F.2d 240, 243 (6th Cir. 1983). In *Dabish*, the Court noted that a contemporaneous limiting instruction may unduly emphasize the evidence in the minds of the jury. *See id.* In *United States v. Miller*, 115 F.3d 361 (6th Cir. 1997), the Court held that the defendant was not substantially prejudiced where the trial judge did not give a contemporaneous limiting instruction but instead incorporated the instruction in its final instructions to the jury. *See id.* In *United States v. Latouf*, 132 F.3d 320 (6th Cir. 1997), the Court did hold that the trial judge erred by not giving an appropriate limiting instruction until after a weekend had passed between the introduction of the evidence and the giving of the instruction. *Id.* at 329. The Court ruled, however, that the trial court's error was harmless given the weight of the other evidence establishing the defendant's guilt. *Id.* More recently, this Court, albeit in an unreported decision, reiterated that a trial judge may appropriately give the limiting instruction during final instructions where the defendant is not substantially prejudiced by the timing. *See United States v. Ruggles*, No. 98-5477, 2000 WL 331970, at **7 (6th Cir. Mar. 24, 2000).

In this case, although the trial judge did not give a contemporaneous limiting instruction, we do observe that during final instructions the court reminded the jury that it had heard evidence that other persons may have committed other illegal acts and that such evidence could not be considered as evidence that Appellant committed the crimes charged in the indictment. *See* Jt. Appx. at 671. The trial court further gave an appropriate instruction to the jury on the proper purposes for which such evidence could be considered. *Id.* at 671-72. Although the instruction was not particularly tailored to the testimony the government elicited from Appellant, we do not find on this record any indication that Appellant requested the trial court to give a more specific instruction during final instructions. Therefore, we believe that Appellant has waived any claim to the adequacy of the instruction actually given. In any event, we think that any prejudice Appellant suffered as a result of the timing of the

the jury had an effect on interstate commerce sufficient to support the convictions.

For purposes of a conviction under 18 U.S.C. §§ 1962(c) & (d), the government need only prove that the enterprise's racketeering activities had a de minimis connection with interstate commerce. *United States v. Riddle*, 249 F.3d 529, 537 (6th Cir. 2001). In *Riddle*, a case involving many of the cast members of this case, the court held that this de minimis standard was satisfied where: 1) the enterprise purchased lottery tickets in Pennsylvania to protect against losses in Ohio; 2) sold in Pennsylvania a ring taken from an Ohio murder victim; 3) extorted money from a victim who sold fireworks in New York; and 4) the government alleged that the Pittsburgh mafia was involved in the enterprise. *Id.* In light of the decision in *Riddle*, we believe that the government adequately established the requisite de minimis connection in this case.

Appellant solicited and received from Lenny Strollo bribe money in order to travel to Atlantic City to gamble. Clearly this act had an effect on interstate commerce. Appellant's characterization of this payment from Strollo as a reimbursement of expenses, as opposed to an up front payment, we find to be a distinction without a difference. The point is that the payment or reimbursement facilitated the opportunity for interstate travel. Appellant extorted campaign contributions from Bruce Zoldan, whose company sold fireworks in interstate commerce.[7] Furthermore, as in *Riddle*, the indictment alleged that the enterprise involved members of the Pittsburgh La Cosa Nostra. Lenny Strollo testified that he was a member of the Pittsburgh family and that proceeds from his illegal gambling operations were transferred across state lines. Jt. Appx. 198-99, 210-11; *Compare United States v. Turner*, 272 F.3d 380, 388 (6th Cir. 2001) (holding, under Hobbs Act, connection to interstate commerce not established

---

[7] We address more fully below why we believe the extortion of Bruce Zoldan had an effect on interstate commerce.

where no evidence suggested that robbery victim's illegal gambling operation crossed over the Michigan border into Ohio). Thus, we are satisfied in this case that the government met its burden of demonstrating that the activities of the enterprise had at least a de minimis connection with interstate commerce.

Turning to the Hobbs Act charges, we find that the government carried its burden of establishing the required connection with interstate commerce with respect to the extortion of Bruce Zoldan as alleged in Count 3 of the indictment. Like RICO, the Hobbs Act only requires a showing of a de minimis connection with interstate commerce. *United States v. Harding*, 563 F.2d 299, 302 (6th Cir. 1977). An exception to the de minimis standard applies, as Appellant correctly points out, where the alleged Hobbs Act robbery or extortion is directed at an individual and not a business. *See United States v. Wang,* 222 F.3d 234, 239-40 (6th Cir. 2000). Appellant argues that the act of extortion was directed at Zoldan as an individual and not at his business. Because, Appellant argues, the extortion was directed at an individual, the government was required to prove a substantial, rather than de minimis, effect on interstate commerce. *See id.* Since according to Appellant the amount to be extorted from Zoldan was relatively small, a few thousand dollars, he argues that the government failed to establish a significant connection to interstate commerce. Even if we adopt Appellant's reasoning as to the applicable standard, we disagree that the Zoldan extortion did not have a substantial connection to interstate commerce. In *Wang*, this Court also noted that a substantial connection could be established by proof that the defendant knew of or was motivated by the victim's connection to interstate commerce. *See id.* at 240 (citing *United States v. Mills*, 204 F.3d 669, 670 (6th Cir. 2000)). In this case, Appellant, through Chicase, threatened to close down Zoldan's fireworks business if he did not make a campaign contribution. We believe the fact that the threat was directed at Zoldan's business, and not at Zoldan personally, even if the money was to have been paid from Zoldan's personal assets, shows that Appellant knew of

We also reject Appellant's contention that the trial judge allowed the government to adduce the contested evidence as a punitive measure for the perceived excesses of trial counsel. While the judge did comment that trial counsel had abused her prior rulings about eliciting character evidence, we believe in toto that the side-bar colloquy merely indicates a recognition on the part of the district judge that counsel was attempting to create a false impression of Appellant that the government was entitled to rebut. *See Segines*, 17 F.3d at 856. Therefore, we find that the trial court's evidentiary ruling was not simply a retaliatory gesture as Appellant contends.

The only issue which gives us some pause is the district court's refusal to give the jury a contemporaneous limiting instruction under Federal Rule of Evidence 105 on the proper uses of the challenged testimony as Appellant's trial counsel requested. Rule 105 provides:

> When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

Fed. R. Evid. 105. Although the Rule states that a limiting instruction shall be given upon request when such evidence "is admitted," the text itself does not clearly require the trial court to give the instruction at the same time the jury is exposed to the evidence. The phrase "is admitted" may reasonably be interpreted to require simply that the trial court give the requested instruction during final instructions, as the trial judge indicated she would do in this case. *But see* 21 Wright & Graham, FEDERAL PRACTICE & PROCEDURE § 5065, at 328 (1977 & Supp. 2001) (stating that Rule 105 requires trial judge to give contemporaneous instruction if requested). In the context of Rule 404(b), which governs the admissibility of prior acts evidence, this Court has held that it is within the trial judge's discretion to decide whether to give the limiting instruction contemporaneous with the

improperly expanded the scope of recross-examination. We think not.

Initially, we do agree that counsel's question ("Did you also know them to be competent hard-working folks?"), as posed to Appellant, was intended to be limited to be to the specific persons identified - Osman, Russo, Colucci, and Farina. We believe, however, that Appellant's answer ("They all were very competent, except for John[.]") expanded upon the question and implied that everyone in the department but Chicase was a competent employee. Therefore, the trial judge did not abuse her discretion by allowing the prosecution to cross-examine Appellant about the performance of other deputies within the department. Furthermore, the testimony the government elicited from Appellant fairly rebuts the implication contained in his answer to the question. The phrase "competent hard-working people" suggests that the persons identified were wholesomely industrious citizens. We do not think that wholesomely industrious law enforcement officers plant evidence, mistake flour for cocaine, or swear out false affidavits in support of search and arrest warrants. Consequently, we reject Appellant's contention that the testimony elicited does not impeach the claim.

We recognize that the testimony showed that Appellant's brother was only indicted, and not convicted of any crime, for the flour/cocaine incident. Appellant, however, admitted that the facts underlying the indictment were true - flour was identified as cocaine and the evidence was later lost and/or destroyed. Therefore, the typical reason for excluding indictment evidence (the indictment is only an accusation, not fact) is not implicated because Appellant's admission established the impeaching fact - that some deputies on his staff were not competent hard-working people. In the false affidavit incident, the deputy actually pled guilty to the charge. Thus here, the government did not elicit any indictment evidence at all.

and was motivated by Zoldan's connection to interstate commerce.[8] Therefore, even if we were to conclude that the government was required to prove a substantial connection to interstate commerce in this case, we believe that standard has been satisfied with respect to Count 3.

We agree with Appellant, however, that the evidence was insufficient to establish even a de minimis connection with respect to the Hobbs Act extortion of the local bookmakers. The specific overt acts of extortion included in the indictment are the raids on the Lane Street gambling operation and the gambling stag at the Open Hearth Restaurant. Reviewing the record supplied to us, we find no evidence that either of these operations affected interstate commerce, nor do we find evidence sufficient to establish a "realistic probability that [either of these operations would] have an effect on interstate commerce." *Wang*, 222 F.3d at 237 (*quoting United States v. Peete*, 919 F.2d 1168, 1174 (6th Cir. 1990)). Regarding the Lane Street operation, there was no evidence regarding its size, amount of profits, who its customers were, or whether money, either incoming or outgoing, traveled across state lines. The only evidence presented was that the operation was located in a bar called "Chuck's Place" and that Lenny Strollo wanted it closed down. *See* Jt. Appx. at 327-28. The same kind of evidence is lacking regarding the gambling stag at the Open Hearth Restaurant. We believe that the lack of evidence presented on these operations' connection with interstate commerce presents a situation nearly identical to the situation in *Turner*, where this Court held that the government failed to establish that the victim's gambling operation had even a de minimis connection with interstate commerce. *See Turner*, 272 F.3d at 388.

The government relies on two cases in support of the proposition that a connection with interstate commerce is established where the gambling business sold goods produced

_____

[8] Alternatively, the threat could reasonably be interpreted as a threat against the business itself, in which case the de minimis standard was easily satisfied.

in interstate commerce, *United States v. Brown*, 959 F.2d 63, 67-68 (6th Cir. 1992) and *United States v. Richardson*, 596 F.2d 157, 160-61 (6th Cir. 1979). Both cases are distinguishable from the present case, however. In *Brown*, which involved a Hobbs Act prosecution for the robbery of a bar, the interstate commerce connection was satisfied by the testimony of a liquor distributer who testified that all of the beer sold by the bar was manufactured outside of the state. *See Brown*, 959 F.2d at 68. No such testimony was presented in this case about the goods sold at Chuck's Place or the Open Hearth Restaurant. In *Richardson*, which also involved law enforcement officers involved in an extortion scheme, there was evidence that alcoholic beverages sold by the victim bars were for the most part manufactured out of state. *See Richardson*, 596 F.2d at 160. Again, no such testimony was presented about the gambling operations involved in this case. We do note that there was testimony from Jeffrey Chrystal, who threw the gambling stag at the Open Hearth Restaurant, that the food served at the party traveled in interstate commerce. Chrystal testified, however, that he catered the food for the party himself from his own restaurant. *See* Jt. Appx. at 402-07. We find no evidence that the food which Chrystal testified had traveled in interstate commerce was provided by either the operators of the stag or the owners of the Open Hearth Restaurant. It does not appear that Chrystal or any of the stag's attendees were targets for extortion - no arrests were made, no citations were issued, and nothing was confiscated. *Id.* at 406. Therefore, we do not think the interstate commerce connection is satisfied for purposes of the Hobbs Act, even under the de minimis standard, where the only connection to commerce is that the patrons brought their own food to the stag.

The government argues that one bookmaker, Mickey Murphy, testified that he got the odds for his operation from a wire service located in New York or Las Vegas. *See* Jt. Appx. at 334. The government contends that this evidence also demonstrates the requisite connection with interstate commerce. We disagree with the government's characterization of Murphy's testimony. There is nothing in

that the trial judge properly determined that the prosecution was entitled to adduce some evidence to rebut the implication that Appellant was a responsible law enforcement officer. The only question that remains is whether the trial judge

---

of arrests of dangerous drug dealers in very dangerous situations and they had to count on each other for their very survival to watch their back. And back in those days, John Chicase had a reputation as being a good cop. He put a lot of drug dealers off the street. On one occasion he saved Phil Chance's life.

\* \* \*

[Chicase] developed this detective agency and security company which put a hundred men on the streets with companies like grocery stores, malls, shopping centers. They obtained a contract, the John Chicase Company, statewide, with the city of Youngstown to provide safety and security for pools and parks and their children.

This was the side of John Chicase that Phil knew. John Chicase had a big contract with General Motors at Lordstown to provide investigative work to service Workman's Compensation fraud with surveillance and reports and undercover activity. He orchestrated all of that and that's the side that Phil knew.

He would come to Phil's home and provided Phil with work when Phil was out of work. Provided him with a living. Would bring food to his home. Loved Phil's mother as she loved him.

This man broke this family's heart for what he did in this case and sure, he was Jeep Garono's cousin, but Jeep Garono you will also learn, ladies and gentlemen, had an enormous landscaping business with city contracts, state contracts, federal contracts, commercial and real estate. And John Chicase was also very close and related to an FBI agent, Bobby Clark. This was the John Chicase that Phil knew.

And you will learn how this one-eyed Jack, ladies and gentlemen, played Phil like a fiddle in scheming with his cousin behind his back to try to endear himself for his own personal gain.

*See* Jt. Appx. 51-53.

For example, unlike *Pearson,* the government was not, in general, attempting to impeach a witness through evidence of an indictment on a prior, unrelated charge. In addition, unlike the case in *Bowen*, the prosecution did not comment upon the fact of Appellant's indictment as proof that he was guilty of the crimes charged. *Gibbs* is distinguishable from the present case because in that case, which concerned a drug conspiracy prosecution, the trial court permitted the government to establish participation in the conspiracy simply through proof that the defendant associated with other gang members who sold drugs. *See Gibbs*, 182 F.3d at 423. In *Kirby*, which involved a prosecution for receiving stolen postage stamps, the trial court permitted the government to prove that the postage stamps were stolen by submitting the transcript of an earlier trial in which three other men pled guilty to stealing the stamps in question. *See Kirby*, 174 U.S. at 53-54. In contrast, we do not think that the testimony elicited by the government tended to establish directly guilt through association with others involved in the same or similar conduct, as was the case in *Gibbs*. Nor did the testimony directly establish an element of any of the offenses, as was the case with the trial transcript in *Kirby*.

Although we have not been furnished the entire trial transcript on this appeal, the discussion during the side-bar conference we quoted *supra* indicates that throughout the trial, Appellant's counsel attempted to paint a picture of Appellant as a good law enforcement official who was betrayed by a trusted associate. Indeed, that was the theme of trial counsel's opening argument.[14] Therefore, we believe

---

[14]In part counsel stated:

[Defendant and John Chicase] worked for Sheriff Traficant in the Sheriff's Department in the 1980s. In the 1980 to 1984 period you will learn they were part of an elite drug task force unit that gained quite a reputation for itself along with an individual they worked with by the name of Paul Bradley who you will meet. This trio gained a reputation of being fearless.

They were responsible for dozens of drug raids, making dozens

Murphy's testimony which indicates where the service he used was located. It further appears that Murphy only assumed that the information came from New York or Las Vegas based on what employees at his service told him.[9] In any event, we think the fact that the betting line originally emanated from New York or Las Vegas is insufficient to establish even a de minimis connection with interstate commerce. *See Turner*, 272 F.3d at 388 (holding connection with interstate commerce not established where victim's illegal lottery was based on winning lottery numbers from Michigan and Ohio).

The government raises several other arguments in support of its contention that a connection with interstate commerce was established with respect to the extortion of the independent bookmakers which we find unpersuasive. The government relies on *United States v. Carmichael*, 232 F.3d 510, 516 (6th Cir. 2000), for the proposition that the requisite connection is established where there is a realistic probability that some of the money to pay the extortion would come from the proceeds of interstate gambling. While we agree that this is a correct proposition of law, this case is distinguishable from *Carmichael* because in *Carmichael* there was specific evidence that the bookmaking operation took bets from gamblers in Kentucky, Alabama, and Tennessee. *See id.* at

---

[9]Murphy testified as follows:

Q. And you said, I believe, that you've got your line or odds from a wire service that you paid for?

A. Yes, sir.

Q. To your understanding, where did that information ultimately come from?

A. Hearing from various people, they said that they got their line from Las Vegas or New York City, depending on who you talked to in the office. It was either New York or Las Vegas.

Jt. Appx. at 334.

513.  As noted above, in this case, there was no evidence presented regarding the client base of the independent bookmakers.  Thus, there was no basis upon which a juror could conclude that money to pay the extortion would come from the proceeds of interstate gambling.  Therefore, *Carmichael* is inapplicable in this case.

Finally, the government relies on *United States v. Ables*, 167 F.3d 1021 (6th Cir. 1999) and *United States v. Wall*, 92 F.3d 1444 (6th Cir. 1996), for the proposition that it is not necessary to prove an effect on interstate commerce on a case-by-case basis because Congress has already determined that illegal gambling itself has an effect on interstate commerce.  We agree with Appellant that these cases are inapposite.  Both *Ables* and *Wall* addressed Congress' authority under the Commerce Clause to enact 18 U.S.C. § 1955,[10] which

---

[10] This section provides in relevant part:

a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.

(b) As used in this section--

(1) "illegal gambling business" means a gambling business which--

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

that the trial court failed to give the jury a proper limiting instruction during final instructions.  While we agree with some of Appellant's arguments as a matter of general principle, we disagree that the trial judge committed reversible error with respect to these evidentiary rulings.

The trial court has broad discretion regarding the scope of cross-examination.  *United States v. Mohney,* 949 F.2d 1397, 1409 (6th Cir. 1991).  Moreover, where one party has "opened the door" on an issue, the opponent, in the trial court's discretion, may introduce evidence on the same issue to rebut any false impression that may have been created by the earlier admission of evidence.  *See United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994).  We review a trial court's rulings on the scope of cross-examination and admissible rebuttal evidence for abuse of discretion.  *See id; Mohney*, 949 F.2d at 1409.

As stated, we agree with Appellant on several points as matters of general principle.  We disagree, however, as to the application of some of those principles to this case.  For instance, we observe that a witness may not be impeached by evidence that he or she was indicted for a crime, since an indictment is not any evidence of guilt.  *See Pearson v. United States*, 192 F.2d 681, 699 (6th Cir. 1951).  We also agree that the prosecution may not comment on the fact that the defendant has been indicted on the crimes being tried as proof of guilt.  *See United States v. Bowen*, 500 F.2d 41, 41n.1 (6th Cir. 1974).  We further agree that establishing guilt by association is also an improper manner by which to obtain a conviction, *United States v. Gibbs,* 182 F.3d 408, 423 (6th Cir. 1999), and that the prosecution may not use proof of another's conviction as evidence against the accused.  *See Kirby v. United States*, 174 U.S. 47, 59-61 (1899).  We think, however, that in general the cases and principles cited to us by Appellant are inapplicable to this case.

---

of their qualifications.

warrant. *Id.* at 538-39. At that point, Appellant moved for a mistrial on the grounds that the AUSA's questions exceeded the permissible scope of cross-examination and that the Court had permitted evidence of an indictment to be proof of guilt. Trial counsel also asked the Court to issue a cautionary instruction to the jury stating that the fact of an indictment is not proof of guilt. *Id.* at 540. The district court denied Appellant's motion for a mistrial on the grounds that trial counsel had repeatedly abused the limitations and rulings on evidence it had given in Appellant's favor. The court also declined to issue the requested cautionary instruction on the grounds that the jury had already been instructed that an indictment is not evidence of guilt and that it would instruct the jury on that point again during the closing instructions. *Id.* at 540-41.

On appeal, Appellant argues that the trial judge committed prejudicial error by allowing the prosecution to suggest that he was guilty of the crimes charge through association with family members and employees of the Sheriff's Department. Appellant argues that his questioning was limited to the four persons specifically identified by trial counsel and that the trial court mischaracterized his testimony as a broad endorsement of all of the persons he hired. Moreover, Appellant argues, evidence that other employees were indicted does not rebut his testimony that the four persons he mentioned were competent and hard-working. Appellant also contends that the trial court allowed the prosecution to inquire about other deputies simply as a punitive measure for perceived excesses of trial counsel.[13] Appellant also claims

---

[13] Appellant also points out that the government first raised on cross-examination the issue of the persons he hired and promoted. We agree with that observation. We note that on cross-examination, the government asked Appellant whether he had hired Russell Osman, Rocky Russo's son, Mark Colucci, and Rick Farina. *See* Jt. Appx. at 490-91. The government's cross-examination, however, was limited to eliciting from Appellant admissions that he had hired these persons. The government did not inquire into their qualifications or job performance. *See id.* Although on this record we are unsure of the overall relevance of this testimony, it was in fact Appellant who first brought to the fore the issue

---

criminalizes the operation of illegal gambling businesses, in light of the U.S. Supreme Court's decision in *United States v. Lopez*, 514 U.S. 549 (1995). In *Lopez*, the Court held that Congress lacked authority under the Commerce Clause to enact the Gun Free School Zones Act, 18 U.S.C. § 922(q), because, *inter alia*, the statute did not contain "a jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Lopez*, 514 U.S. at 561. The Court further noted that "neither the statute nor its legislative history contain[s] express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone." *Id.* at 562; *see also Wall*, 92 F.3d at 1447 (analyzing *Lopez*). In applying *Lopez* to § 1955, the *Wall* Court observed that like § 922(q), § 1955 does not have a jurisdictional element to ensure on a case-by-case basis that the illegal gambling in question has an effect on interstate commerce. *Wall*, 92 F.3d at 1450. Unlike § 922(q), however, the Court noted that the legislative history of § 1955 contains "reams" of information supporting a specific finding by Congress that illegal gambling makes widespread use of and has an effect on interstate commerce. *Id.* As a result, the *Wall* Court concluded that "18 U.S.C. § 1955 is a proper exercise of congressional power under the United States Constitution." *Id.* at 1452. The Court in *Ables* essentially followed the reasoning of the panel in *Wall*.

---

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established.

18 U.S.C. § 1955.

In contrast, as Appellant correctly points out, the issue presented here does not involve a challenge to Congress' power under the Commerce Clause to enact the Hobbs Act. Moreover, unlike both § 922(q) and § 1955, the Hobbs Act contains a specific jurisdictional element which ensures the act in question affects interstate commerce on a case-by-case basis. *See* 18 U.S.C. § 1951("Whoever in any way or degree obstructs, delays, or *affects commerce or the movement of any article or commodity in commerce . . . .*") (emphasis added). Thus, because the statute contains a jurisdictional element, there is no need to examine congressional findings to determine whether the Hobbs Act is an appropriate exercise of legislative power under this Court's decisions in *Ables* and *Wall*. However, what *Ables* and *Wall* do not stand for is the proposition that the government really asserts - that the prosecution is relieved from proving an essential element of the offense by proof beyond a reasonable doubt where Congress has made findings of fact concerning the area regulated. Of course, under the Hobbs Act, the government is required to prove beyond a reasonable doubt the interstate commerce element. *See Turner*, 272 F.3d at 389. No congressional findings of fact can substitute for proof on this element.

For the reasons stated above, we find the evidence with regard to the interstate commerce connection sufficient to sustain the convictions on Counts 1, 2, and 3 of the indictment. With respect to Count 4 of the indictment, however, we find that the evidence was insufficient to support a connection with interstate commerce under the Hobbs Act. Accordingly, Appellant's conviction on Count 4 of the indictment is reversed.

### 3. *Appellant's Involvement in Extortion Conspiracies*

Appellant's next assignment of error charges that the evidence was insufficient to establish that he had any culpable involvement in extorting campaign contributions from Bruce Zoldan, as alleged in Count 3 of the indictment, or extorting a street tax from independent bookmakers, as alleged in

Mr. Yelsky: He did say that.

The Court: Part of my problem, Mr. Lonardo, is that I have given you a lot of places in which I have attempted to limit the government, and each time, in my view, you abuse those limitations. With respect to this whole thing about Bruce Zoldan, I said they weren't allowed to bring out he fired him because he didn't trust him, and you bring out evidence and testimony saying that he gave him a completely different job offer.

You painted a completely different picture with respect to the Juanita Rich thing. I limited the government, and you in opening statement and throughout your cross-examination of Mr. Strollo kept holding her out, despite the limitations I placed on the government.

You know, I can't be in a position where I give you the benefit of rulings and then you abuse them.

* * *

I'm going to allow you to recross to talk about the individuals that he hired.

Jt. Appx. at 528-32.

On recross-examination, the government queried Appellant about two specific instances of misconduct involving members of the Appellant's department. The first involved a drug raid led by Jeff Chance, Appellant's brother, in which a bag of powder was seized. Based on information provided to him, Appellant represented to the media that the bag contained cocaine when in fact it contained flour. The bag was never booked into evidence. The trial court permitted the government to elicit testimony from Appellant that his brother was under indictment from this incident on unspecified charges. Jt. Appx. at 535-38. The government also adduced testimony from Appellant that another one of his deputies, Antonio Owens, had pled guilty to obstructing justice for falsely swearing out an affidavit in support of a search

The Court: You have opened a lot of doors, and I think the government could have driven through a lot of them and they haven't.

I think at this point it probably would have been fair game for them to go into all that stuff, and it is certainly fair game at this point for them to address.

Mr. Yelsky [Defense co-counsel]: Indictments?

The Court: You just had him testify to the character and the quality of the individuals he hired, and–

Mr. Yelsky: He didn't hire Jeff Chance.

Mr. Morford: He promoted him.

The Court: You said hired.

Mr. Morford: You opened the door.

Mr. Yelsky: Wait a minute. He did not hire Jeff Chance. We didn't mention his name.

Mr. Lonardo: Just so the record is clear, the record will speak for itself, I mentioned these four people. If it's construed I'm talking about his entire department, that was not my intent.

Mr. Morford: By mentioning that, even if that's all you did, and I don't think that's what you did, by mentioning that these four of the people he hired or promoted are very hard-working competent good people, you've opened the door to about the fact that key people he hired are not in–and his last comment was that John Chicase was the only bad person he hired.

The Court: The only bad person, that's what he said.

Mr. Morford: That's what it was. Now he's opened the door.

Count 4 of the indictment. As we have already reversed Appellant's conviction as to Count 4, we need only address whether the evidence was sufficient to sustain a conviction for the conspiracy to extort Bruce Zoldan. Although we agree with the district court that the evidence supporting this conviction was not strong, we do believe that there was sufficient evidence for the jury to infer that Appellant was involved in a scheme to extort campaign contributions from Zoldan.

Zoldan testified that his chief security officer, Bob Martino, told him that Chicase told Martino to tell him that he (Zoldan) "did not treat the Chance campaign fairly and did not give what [he] was able to afford to give and that it won't be forgotten about, won't be forgotten, and that [he] will pay the price." Jt. Appx. at 88. Martino testified that Chicase told him to relay a message to Zoldan: "[I]f Bruce didn't come across he [Chicase] was going to shut his operation down." *Id.* at 102. Chicase stated that during the campaign he and Appellant discussed closing down Zoldan's fireworks business on the 4th of July because Zoldan had not contributed to the campaign, although "it wasn't a definite thing." *Id.* at 371. Chicase could not remember if he told Martino that Appellant was considering shutting down Zoldan, but did admit that he might have said that. *Id.* at 371-72. O'Nesti testified that Appellant told him that if Zoldan did not "come up with how many thousands, screw him, he's got the fourth of July and everything goes down, I will shut him down." *Id.* at 176. Although there are gaps in the evidence, there are enough details to support an inference that Appellant and Chicase conspired to extort campaign contributions from Zoldan. We think the fact that the threats Chicase and Appellant made against Zoldan[11] mirror their

---

[11]We recognize that Appellant made his statement to O'Nesti and not Zoldan. That Appellant made the threat at all, however, is indicative of a state of mind to retaliate against Zoldan for not supporting his campaign. In any event, the overall evidence indicated that Chicase was Appellant's communications liaison. Therefore, we do not think it important that Appellant did not communicate this threat directly to Zoldan or

initial conversation on the subject during the campaign indicates that at some point in time after this conversation Appellant and Chicase reached an agreement to extort Zoldan for campaign money. Furthermore, we believe it irrelevant that Chicase did not make the threat until after the campaign was over since Zoldan testified that his contributions were made to help pay off Appellant's campaign debts. *See* Jt. Appx. at 87-88.

Accordingly, for the reasons stated, we believe the evidence was sufficient to support the jury's conclusion that Appellant was involved in a conspiracy to extort campaign contributions from Bruce Zoldan in violation of the Hobbs Act. Therefore, this assignment of error is not well-taken.

### 4. *Obstruction of State or Local Law Enforcement*

Appellant next contends that the evidence was insufficient to support a conclusion that the Greek Coffee House was an "illegal gambling business" within the meaning of 18 U.S.C. § 1511. Therefore, Appellant argues, his conviction for violating § 1511 as alleged in the indictment should be reversed.

Section 1511 provides in relevant part:

(a) It shall be unlawful for two or more persons to conspire to obstruct the enforcement of the criminal laws of a State or political subdivision thereof, with the intent to facilitate an illegal gambling business if--

(1) one or more of such persons does any act to effect the object of such a conspiracy;

(2) one or more of such persons is an official or employee, elected, appointed, or otherwise, of such State or political subdivision; and

specifically order that it be communicated to Zoldan.

also mentioned–who was the third one I mentioned–it is nobody under indictment or anybody that is in trouble.

The Court: You know, Mr. Lonardo, the government has held back extremely. You have brought out so many references of trying to make this man out to be the most honorable man that ever walked down the pike.

You have talked about character evidence, you have talked about Juanita Rich being the savior of Mahoning Valley. They haven't directly approached any of those, but you opened the door to this, and I am going to allow some limited cross.

I'm not going to allow, I'm not going to open this trial and have a mini-trial on all these individuals, but he has the right to question him about the character of these people.

Mr. Morford: There is one other point–and I'm not going to pursue it, but if he continues to open doors then I'm going to continue to pursue these–he asked about whether Mr. Chance's opponents were smearing his good reputation, knowing that one of the things that they accused him of was failing a polygraph when there were documents to show it, and the Court has asked us to stay away from that.

These are the kinds of things they're doing and if they're going to open those doors we're going to start going through them.

We have been very careful not to do those kind of things, and as you said about Juanita Rich, the defendant through his counsel yesterday conceded to us that Mr. Chance did meet with her in hotel rooms and had sexual encounters. But if they continue down this road and continue to present this man as something he's not, then they're opening the door, and we'll begin to respond in kind.

Mr. Lonardo [defense counsel]: I didn't mention his brother.

Mr. Morford: You asked about employees who are competent.

The Court: Competent hard-working people.  Are you crazy?  You just opened the biggest door to bring a truck through.

Mr. Morford: Maybe I should drive the truck through.  I would like to leave the answer and pursue that on recross.

Mr. Lonardo: I asked about Russell Osman.

Mr. Morford: You asked about the employees were competent people that he [Appellant] promoted.  He promoted his brother.

Mr. Lonardo:  I specifically asked about four people. Russell Osman–

* * *

The Court:You asked if the employees that he hired were all competent hard-working–

Mr. Lonardo: No, I just asked about those four.

* * *

Mr. Morford: You tried to create the impression that these people he hired and promoted are honest hard-working people, and you know they're not.

Mr. Lonardo: No. I asked the question regarding four people,  that  he–you  mentioned  Russell  Osman,  I mentioned  Russell  Osman.  You  mentioned  Rocky Russo's son, I mentioned Rocky Russo's son.  I think I

(3) one or more of such persons conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business.

(b) As used in this section--

(1) "illegal gambling business" means a gambling business which--

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

18 U.S.C. § 1511.  Appellant argues that the evidence was insufficient to support a conclusion that five or more persons conducted or managed the alleged illegal gambling business for the continuous thirty day period.[12]  Therefore, Appellant argues, his conviction on Count 5 of the indictment should be reversed.  We agree with Appellant that the evidence was insufficient to support a finding that five or more persons conducted an illegal gambling business or that it was in substantially continuous operation for more than thirty continuous days.

Initially we note that in order to determine whether the government has established the "illegal gambling business"

---

[12]Appellant correctly points out that although the government could also prove a violation of § 1511 by showing that the illegal gambling business grossed more than $2,000 in any day, there was no evidence presented regarding the cash flow of the barbut game held at the Greek Coffee House.  Therefore, the government was required to prove that the illegal gambling business was in substantially continuous operation for thirty or more days.

element of § 1511 we may consult case law interpreting 18 U.S.C. § 1955, which includes as an element of the offense the identically defined "illegal gambling business." *See* 18 U.S.C. § 1955(b)(1); *see also United States v. Marrifield*, 515 F.2d 877, 880 (5th Cir. 1975) (stating that § 1511 and § 1955 have been construed *in pari materia*). We are not satisfied that the evidence demonstrated that the government established by proof beyond a reasonable doubt the five person requirement of § 1511. The five person requirement can "be satisfied at any point during the thirty days, regardless of the duration of the person's involvement in the business, so long as his or her participation is either *regularly helpful or necessary* to the operation of the gambling enterprise." *United States v. Mick*, 263 F.3d 553, 568 (6th Cir. 2001) (emphasis added)(internal quotation omitted).

The only evidence submitted in support of Count 5 was the testimony of Jeep Garono and Lenny Strollo. Garono testified that when he controlled the barbut game at the Greek Coffee House the participants were Garono, Victor Malis, with whom Garono split profits, Victor Malis's brother, who was a dealer, and "another Greek kid who dealt there." *See* Jt. Appx. at 298-99. Garono's testimony establishes only that four persons participated in the gambling business when he was in charge. Garono did testify that Gary Goodrick dealt at the Greek Coffee House, but not until after he had turned the game over to Bernie Altshuler. *Id.* at 299. Lenny Strollo testified that he split the profits from the game with Bernie Altshuler and Victor Malis and that Eddie Pruneski was a dealer and that Gary Goodrick dealt there "on occasion." *Id.* at 220-21. Although clearly more than five people were involved over the life of the operation, we find no evidence that five or more people were involved during any single thirty day period. *Compare with Marrifield*, 515 F.2d at 880-81 (under § 1955, holding that five person requirement met even though only four persons were present at business at one time because the evidence showed that there were five active participants who rotated through four positions). For instance, although Strollo shared profits with Bernie Altshuler when Altshuler had the game, there was no evidence that

Q. who is a friend of yours, worked in the campaign. Rocky Russo's son–

A. Yes.

Q. who was hired as a deputy. Mark Colucci as a personnel adviser, correct?

A. Correct.

Q. Your cousin Rick Farina, correct?

A. Correct.

Q. Did you ever consider hiring your political enemies?

A. No, sir.

Q. Have these individuals that I just mentioned, were they loyal campaign workers in your campaign?

A. The majority of them, yes.

Q. Did you also know them to be competent hard-working folks?

A. Yes, they were all very competent, except for John [Chicase], he became a disappointment.

Jt. Appx. at 527. At that point, the AUSA asked to approach the bench for a side-bar conference.

The following discussion, which we quote at length, took place during the side-bar:

Mr. Morford [AUSA]: I'm going to ask that that last question and answer be stricken or he's opened the door for me to get into the fact that half the department is under indictment; that they go out and they plant drugs in raids, including his brother.

issue were sufficient to carry the day in that the barbut game at the Greek Coffee House probably meets the thirty day requirement.  In a criminal case, however, the government cannot meet its burden of proof by imparting a general impression that the defendant's conduct meets one of the elements of the offense, particularly where there is no apparent reason, other than carelessness, for not adducing more specific testimony on the issue.

Accordingly, for the reasons stated, we find that the evidence was insufficient for the jury to find that the barbut game at the Greek Coffee House meets either the five person requirement or the thirty day requirement of § 1511.  Therefore, the government failed to prove that the barbut game was an "illegal gambling business" under § 1511 and thus failed to prove an essential element of the offense.  Consequently, Appellant's conviction on Count 5 of the indictment must be reversed.

### B. *Scope of Cross-Examination*

Appellant next claims that he was denied a fair trial when the district judge permitted cross-examination which suggested guilt through association.  This alleged error, Appellant argues, merits reversal of each of his convictions and remand for a new trial.

This assignment of error stems from the trial judge's ruling that on re-direct examination of Appellant, Appellant's trial counsel "opened the door" for the prosecution to inquire into the criminal indictments and prosecutions of certain subordinates of Appellant's within the Mahoning County Sheriff's Department.  On re-direct examination, Appellant testified as follows:

Q. Now, [AUSA] Morford also asked you some questions regarding employees that you hired.  Do you recall that?  You said that Russell Osman–

A. Correct.

Strollo shared profits with Garono when Garono ran the game. In addition, although Strollo's testimony identifies five people who were involved in the game when he shared profits with Bernie Altshuler, he testified that Gary Goodrick dealt only "on occasion."  We do not believe testimony that Goodrick dealt "on occasion," without further amplification as to the frequency of the occasions, is sufficient to show either regular or necessary participation in the alleged gambling business.  *See, e.g., United States v. Murray*, 928 F.2d 1242, 1248-49 (1st Cir. 1991) (holding that five-person requirement not satisfied where bartender took bets on only four occasions over fifty-six day period).  Therefore, Strollo's testimony, we find, establishes that only four persons participated in operating the barbut game during the time that he participated in the operation.

Moreover, we find that the five-person requirement is not satisfied by evidence that the cumulative number of participants in the alleged illegal gambling business was five or more.  The legislative history to § 1511 indicates that in enacting §§ 1511 and 1955 Congress intended only to regulate illegal gambling activities of a particular size or scope. *See United States v. Tarter*, 522 F.2d 520, 525-26 (6th Cir. 1975) (explaining legislative history).  The fact that an operation has employed more than four people over the course of its existence does not necessarily increase the size or scope of its activities in order to bring it within the reach of the statute.  For instance, over a period of time, three principal operators of a card game may employ fifteen different dealers, but only one at a time and only in succession.  In such a case, the card game would not be an "illegal gambling business" because it never had more than four active participants at any one time.  The evidence adduced in the present case parallels our example.  Although the evidence presented by the government suggests that over time perhaps as many as nine persons were involved in the barbut game at the Greek Coffee House, their participation was successive and not simultaneous.  At most, the testimony establishes that four persons (Garono, Victor Malis, Malis's brother, and "the Greek kid") were involved when Garono controlled the game

and that he turned the game over to Bernie Altshuler, and then essentially a different cast of four persons (excluding Goodrick) ran the operation (Altshuler, Strollo, Malis, and Pruneski). Thus, we reiterate, the evidence presented by the government was insufficient to establish the five person requirement of § 1511(b)(1)(ii).

Furthermore, we are unconvinced that the government proved beyond a reasonable doubt that the barbut game at the Greek Coffee House was in substantially continuous operation for thirty or more days, as is required by § 1511(b)(1)(iii). As we read the trial transcript provided, there is a general sense imparted from the testimony that the barbut game may have been in existence for a number of years. The government, however, never elicited testimony which described the specific time periods the game was in operation. For instance, Jeep Garono testified as follows:

Q. What kind of activity took place at the Greek Coffee House?

A. Are we talking 80's?

Q. Let's talk 80's and more recent time; what's the main game they played?

A. Barbute [sic].

*See* Jt. Appx. at 298. Garono then goes on to testify about how barbut is played and states later that he turned the game over to Bernie Altshuler after the FBI raided a Super Bowl party in 1996. Reading Garono's testimony we find it unclear: 1) whether barbut was in fact played at the Greek Coffee House in the 1980's; 2) when Jeep Garono assumed control of the game; 3) if the game was in existence between the 1980's and the time Garono assumed control of the game; and 4) whether the game was held on a regular basis after Garono assumed control of the game. *See Tarter,* 522 F.2d at 525 ("The provisions of [sections 1511 and 1955] do not apply to gambling that is sporadic or of insignificant monetary proportions.") (quoting legislative history); *United States v.*

*Trupiano*, 11 F.3d 769, 773-74 (8th Cir. 1993) (stating "substantially continuous" does not mean every day; rather "the operation . . . must be one that was conducted upon a schedule of regularity sufficient to take it out of the casual nonbusiness category.")(quoting *United States v. Nerone*, 563 F.2d 836, 843 (7th Cir. 1977)).

Lenny Strollo's testimony on this point is similarly non-specific and we think the government exaggerates if not distorts his testimony by arguing that he testified that gambling had been going on at the Greek Coffee House "for years." *See* Gov't's brief at 39. Strollo testified as follows:

Q. What is the Greek Coffee House?

A. It's a coffee house that the Greeks have had for years that they congregate together and they play short cards, and when I say short cards, you know, they have Greek games like Greek rummy. And just to pass the time and they sell their Turkish coffee.

Q. What happens at night after hours?

A. Barbute [sic], and the game barbute [sic] is a Greek game. It's a dice game.

Q. Is it a gambling game?

A. Yes.

Jt. Appx. at 220. In fact, Strollo testified only that the Greeks have owned the coffee house for years, not that gambling had gone on there for years. Like Garono's testimony, Strollo's overall testimony is lacking in details as to the frequency with which the game was conducted, although, as stated, there is a general sense that the barbut game was held on a regular basis for a number of years. Frankly, we find the gaps in the evidence astounding given that the government called on two of the game's proprietors, who presumably knew all the details of the operation, to provide testimony in support of the charge. Were this a civil matter, we think the proofs on this