RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0201P (6th Cir.)
File Name: 04a0201p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
     *Plaintiff-Appellee,*

*v.*            No. 02-6278

ROBERT KOCH,
     *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 01-00083—Joseph M. Hood, District Judge.

Argued: April 28, 2004

Decided and Filed: June 29, 2004

Before: GUY and GILMAN, Circuit Judges; BARZILAY,
Judge.*

_____

**COUNSEL**

**ARGUED:** H. Louis Sirkin, SIRKIN, PINALES &
SCHWARTZ, Cincinnati, Ohio, for Appellant. Laura K.

_____

* The Honorable Judith M. Barzilay, Judge, United States Court of
International Trade, sitting by designation.

Voorhees, ASSISTANT UNITED STATES ATTORNEY,
Covington, Kentucky, for Appellee. **ON BRIEF:** H. Louis
Sirkin, Jennifer M. Kinsley, Jarrod M. Mohler, SIRKIN,
PINALES & SCHWARTZ, Cincinnati, Ohio, for Appellant.
Laura K. Voorhees, ASSISTANT UNITED STATES
ATTORNEY, Covington, Kentucky, Charles P. Wisdom, Jr.,
ASSISTANT UNITED STATES ATTORNEY, Lexington,
Kentucky, for Appellee.

_____

**OPINION**

_____

JUDITH M. BARZILAY, Judge. Defendant-Appellant
Robert Koch appeals from his sentence entered on October 3,
2002 in the Eastern District of Kentucky after his conviction
by a jury on drug and firearm offenses. He argues that the
district court: (1) erred in calculating the amount of drugs
involved in the conspiracy; (2) misapplied the sentencing
guidelines to make a two-level adjustment for possessing a
firearm; and (3) improperly granted an upward departure on
the minimum 10-year sentence under 18 U.S.C.
§ 924(c)(1)(A)(iii). Because the district court did not abuse
its discretion in sentencing Koch, we **AFFIRM** the district
court's decision on all three points.

### BACKGROUND

Koch, now twenty-six years old, made his living by buying
illegal narcotics from Arizona and selling them in his home
state of Kentucky. This case revolves around incidents that
took place on two separate dates in 2001: April 27 and
October 12.

Early on the morning of April 27, Koch went to Justin
Davis' trailer home to collect a $5,000 drug debt owed on five
pounds of marijuana. Davis was Koch's "frontman" selling
drugs. "Fronting" denotes supplying narcotics on credit.

Koch had been upset about the $5,000 and did not believe Davis' claim that the five pounds of marijuana he gave to Davis had actually been stolen.

Koch persuaded three other men, Patrick O'Brien, Robert Gibson, and Joe Shukler, to accompany him to Davis' residence. Because Koch was too intoxicated to drive, Shukler drove Koch's truck. When the men arrived at Davis' home, the truck engine noise and barking dogs woke Davis and his roommate Luke Hitchner. Koch walked up to the house with Gibson while O'Brien and Shukler remained in the truck. Both Koch and Gibson were carrying firearms. Koch banged on the door and demanded that Davis and Hitchner come outside. Hitchner opened the door and, suspicious of Koch's intentions, reached for his handgun. Hearing Hitchner and Koch argue at the door, Davis also grabbed a gun.

Moments later, mayhem ensued with guns blazing. It is unclear who fired the first shot; it is, however, clear that Davis, Gibson, and Koch each fired multiple times. Koch's Colt .45 handgun and .45 shell casings were found near the scene. Koch himself apparently fled the scene on foot without being hit.

Koch maintains that he went to see Davis that day merely to scare him and that he did not intend to harm anyone. Regardless of Koch's intentions, however, a serious injury and a death resulted from the shootout. As O'Brien and Shukler were fleeing the scene, speeding off in the truck, O'Brien was shot in the back of his head by Davis. Consequently, O'Brien has lost the use of his left eye and also suffers from a balance disorder and short-term memory loss. Gibson, who was with Koch at the house, died from a bullet also fired by Davis.

A few weeks after the shootout, Koch went to visit his friend Gary Ballard in prison. According to Ballard, a dealer serving time for drug-related crimes, Koch admitted that he

and "his boys" had "loaded up for bear," meaning they had loaded guns, and went to Davis' residence. Koch told Ballard that in addition to the Colt .45 found at the scene, he was carrying a 9 mm gun which he later stashed in the woods as he was fleeing.

Approximately six months after the shootout, on October 12, 2001, the police searched Koch's house pursuant to a warrant. During the October 12 search, officers discovered in Koch's bedroom a loaded 9 mm Beretta handgun, night vision goggles, thirty-one rounds of 9 mm ammunition, over one thousand dollars in cash, and some marijuana. Elsewhere in the house officers found marijuana drying in a closet, marijuana growing equipment, marijuana seeds, and marijuana roaches.

According to his girlfriend Courtney Byrnes, after the shootout Koch toned down his drug activities considerably. He was afraid of retaliation by Davis or an investigation by the police. He stopped large scale dealing and stopped hanging out with the "old crowd." He sold some of his assets and was being partially supported by his parents and Byrnes. He continued, however, growing marijuana for personal use and for occasional sale to friends.

For the events occurring on April 27 and October 12, 2001, Koch was indicted on six counts relating to drug possession, conspiracy, and firearm offenses. At trial, the jury found him guilty on counts 1, 2, 3, 4, and 6 of the indictment, and acquitted him on count 5. At sentencing, the trial court departed from the probation officer's recommendation and the applicable sentencing guidelines, sentencing Koch to 248 months in prison.

In particular, on counts 1, 3, 4, and 6, the district court enhanced the recommended sentence by increasing the base offense level to 30 (from the recommended 18) because it determined that 2,000 pounds (907 kilograms) of marijuana were involved in the conspiracy. Two additional levels were

added for the "specific offense characteristic" of possession of a dangerous weapon (not recommended), and 2 levels for obstruction of justice (recommended). The district court thus sentenced Koch to 60 months in prison on counts 1, 3, 4, and 6 to run concurrently.

The district court also granted the government's motion for a six-level upward departure on count 2. Pursuant to 18 U.S.C. § 924(c)(1)(A)(iii) (2000), count 2 already carried a ten-year mandatory minimum for using or carrying a firearm (and discharging the firearm) during and in relation to a drug trafficking crime, to run consecutively to any other sentence. To effectuate the upward departure, the district court used U.S.S.G. §§ 5K2.1 and 5K2.2 (2001) because the death of one person and a permanent injury to another person had resulted during the incident in question. The district court's decision increased Koch's sentence on count 2 to 188 months (from the statutory minimum of 120).

## Analysis

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This court has jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

**(1)** *The base offense level increase*.

The base offense level for drug trafficking crimes is determined pursuant to U.S.S.G. § 2D1.1(a) (2001). Koch's case falls under subsection (a)(3) and, therefore, his base offense level is determined by consulting the provision's Drug Quantity Table found in subsection (c).

Koch argues that the district court erred in finding that 2,000 pounds of marijuana was involved in the conspiracy. *See Def.'s Br.* at 23. Koch contends that the witnesses who testified at sentencing had an incentive to lie in order to minimize their role in the conspiracy and receive a reduced sentence from the prosecution. *See id.* Koch further argues

that the district court should have disregarded their testimony entirely instead of arriving at a compromise figure. *See id.* at 24. The government responds that when "no drugs are seized, the sentencing court must approximate the quantity," and such determination is reviewed for clear error. *Pl.'s Br.* at 23 (citations omitted). The government argues that the district court's determination does not constitute clear error.

In this circuit, "a district court's decision on the amount of [drugs] a defendant is to be held accountable for is a finding of fact which must be accepted by a court of appeals unless clearly erroneous." *United States v. Walton*, 908 F.2d 1289, 1300-1301 (6th Cir.), *cert. denied*, 498 U.S. 990 (1990). "[W]here a fact is crucial to the determination of a defendant's guidelines base offense level or criminal history score then it must be proven" by a preponderance of evidence. *Id.* at 1302. That is, "the guidelines do not permit the District Court to hold a defendant responsible for a specific quantity of drugs unless the court can conclude the defendant is more likely than not *actually* responsible for a quantity greater than or equal to the quantity for which the defendant is being held responsible." *Id.* "If the exact amount cannot be determined, an estimate will suffice, but here also a preponderance of the evidence must support the estimate." *Id.*

The district court did not err in finding that approximately 2,000 pounds of marijuana was involved in the conspiracy. Because the jury never determined the amount of drugs involved, the district court needed to make that factual determination during sentencing. *See* U.S.S.G. § 2D1.1 cmt. 12. Relying mainly on new testimony given at sentencing, the district court arrived at a 2,000 pounds estimate. The 2,000 pounds estimate is supported by a preponderance of evidence. A drug dealer who worked for Koch (Bybbe) testified that he made over eight trips and delivered two to three hundred pounds at a time for Koch. He also testified that he once saw a "ton" of marijuana in Koch's house in the upstairs bedroom. The district court discounted the latter testimony and interpreted the "ton" figure to mean 1,000

pounds. The court multiplied three hundred by eight, and then added 1,000. The court then reduced the estimate to 2,000. The drug quantity estimate was thus conservatively made. *Cf. Walton*, 908 F.2d at 1302 (warning that the sentencing court should "err on the side of caution"); *United States v. Meacham*, 27 F.3d 214, 216 (6th Cir. 1994).

Moreover, testimony and other evidence revealed that Koch made his living primarily from drug dealing and supported two dependents (although he was not generating large amounts of money before February 2001, according to Byrnes). He was a central figure in the conspiracy. At least two people (Bybbe and Davis) sold drugs he provided. His friend Ballard testified that the drug dealing went as far back as 1998. Multiple witnesses mentioned a large shipment from Arizona. While he may not have had a "lavish" lifestyle as characterized by the government, *Pl.'s Br.* at 10, Koch nevertheless lived in a comfortable house and owned two vehicles and other assets. He often had large quantities of cash. That is, it is more likely than not that the amount of drugs he was involved with was fairly large (and certainly more than recommended by the probation officer, who by his own admission was not able to review all the evidence implicated and did not have the advantage of testimony given at sentencing).

**(2)** *The specific offense characteristic increase.*

The sentencing guidelines allow a two-level increase "[i]f a dangerous weapon (including a firearm) was possessed" in a drug related crime. U.S.S.G. § 2D1.1(b)(1). "The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons." U.S.S.G. § 2D1.1 cmt. 3. "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id.* The comments give the example of an unloaded hunting rifle found in a home, also containing drugs, as falling outside of the provision. *See id.*

The Sixth Circuit reviews "a district court's factual findings under U.S.S.G. § 2D1.1(b)(1) for clear error." *United States v. Miggins*, 302 F.3d 384, 390 (6th Cir. 2002).

Koch argues that the district court erred in enhancing his sentence on the possession of the Beretta on the basis that such increase is unwarranted when a defendant is convicted for violation of 18 U.S.C. § 924(c), as he was on Count 2. *See Def.'s Br.* at 24 (citation omitted). It is clear that the sentencing judge cannot apply a section 2D1.1(b)(1) enhancement when a defendant is also convicted and sentenced for a 18 U.S.C. § 924(c) violation on the same charge "because to do so would constitute impermissible double-counting." *United States v. Saikaly*, 207 F.3d 363, 367 (6th Cir. 2000) (citation omitted). Here, Koch was convicted and sentenced for a section 924(c) violation in Count 2 with respect to his possession of the Colt .45 during the April 27 shooting incident. The two-level enhancement, on the other hand, was imposed for his possession of the Beretta found during the October 12 search, for which he was convicted on Count 6. If the drug offenses on the two dates are the same, under *Saikaly*, the district court cannot order the enhancement. However, if they are distinct and separate, no case cited prohibits the enhancement.

Koch contends that when the Beretta was found on October 12, 2001, the drug conspiracy was still ongoing. *See Def.'s Br.* at 25. In fact, Koch states, while the conspiracy may have been "taper[ing] off, . . . [l]aw enforcement [nevertheless] found the remnants of the conspiracy when they raided Mr.Koch's home on October 12, 2001." *Def.'s Reply Br.* at 8. Accordingly, the first question is whether the drug conspiracy ended on April 27 such that drugs found on October 12 gave rise to a separate drug offense.

First, the jury found that the drug conspiracy ended on April 27, 2001 after the shooting after Davis and Koch had a falling out and all individuals involved went their separate ways. Further, the jury's finding is supported by sufficient

evidence in the record. Koch's lifestyle changed considerably after the April 27 shooting. He stopped associating with the others in the conspiracy (except the prison visit to Ballard) and ceased dealing (except occasional small sales to friends for personal use). The others in the conspiracy were either dead, injured, in prison, under investigation, or simply not around. Even though the October 12 search recovered some "remnants" of the conspiracy (possibly including the Beretta 9 mm), the district judge did not commit a clear judgment of error in determining the end of the conspiracy as April 27.[1]

After determining that the conspiracy ended on April 27, the question then becomes whether the parties met their respective burdens of proof under U.S.S.G. § 2D1.1(b)(1). In order to "obtain an enhancement pursuant to § 2D1.1(b)(1), the government must show by a preponderance of the evidence that the defendant possessed the firearm during the drug-trafficking offense." *Saikaly*, 207 F.3d at 368 (citation omitted). Once the government establishes that a firearm was "possessed" and that the firearm was "present," "a presumption arises that such possession was connected to the offense." *United States v. Hardin*, 248 F.3d 489, 497 (6th

---

[1]The issue here is not whether the offenses occurred on the same dates, but whether the two offenses are relevant conduct. *See United States v. Peveler*, 359 F.3d 369, 378 n.3 (6th Cir. 2004). Here, the district court made no explicit relevant conduct determination, and none is challenged. The two-level enhancement for the Beretta when another count of the conviction involved section 924(c) rests on the district court's finding that the conspiracy ended on the date of the shootout. In any event, the weapon enhancement did not increase Koch's sentence because Koch was given a sixty-month mandatory maximum sentence on counts 1, 3, 4, and 6. *See* 21 U.S.C. § 841(b)(1)(D). Regardless of whether or not the weapon enhancement was applied, the mandatory maximum was far less than the sentencing range of Koch's base offense level of 30 plus the obstruction of justice enhancement. We observe that even if the district court's grouping of count 1 (which had the related 924(c) conviction in count 2) and count 4 for the purpose of determining the base offense level was error, such error was harmless because it had no impact on the actual sentence he received. Accordingly, no remand is necessary. *See Williams v. United States*, 503 U.S. 193, 194 (1992).

---

Cir. 2001) (citation and quotation omitted). At that point, "the burden shifts to the defendant to show that it was clearly improbable that the [firearm] was connected to the offense." *Saikaly*, 207 F.3d at 368.

Here, the Beretta was found in the same room (Koch's bedroom) as some marijuana. In other parts of the house, more marijuana and various indicia of a marijuana growing operation were found. Thus, it is more likely than not that the Beretta was possessed in connection with drug activity. Furthermore, as the government points out, Koch did not present any evidence that the Beretta was not connected to drug activity. "In fact, he presented no evidence to the district court to show that it was clearly improbable that the firearm was associated with the drug crime." *Pl.'s Br.* at 27. Therefore, the sentencing judge did not err in enhancing the sentence because of the Beretta.

**(3) *The six-level upward departure*.**

With respect to count 2, the sentencing guidelines provide that "[i]f the defendant . . . was convicted of violating [18 U.S.C. § 924(c),] the guideline sentence is the minimum term of imprisonment required by statute." U.S.S.G. § 2K2.4(a)(2) (2001). This section contains no explicit authorization for an upward departure. Elsewhere, however, the sentencing guidelines authorize upward departures when death and "significant" physical injury are present, while not conditioning the authorization on the type of underlying crime. *See* U.S.S.G. §§ 5K2.1 & 5K2.2.

If a death results, before enhancing the sentence, the sentencing court must examine accompanying factors, such as "the defendant's state of mind, . . . the degree of planning or preparation, . . . whether multiple deaths resulted, and the means by which life was taken." U.S.S.G. § 5K2.1. Furthermore, the increase should be in proportion to "the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and

the extent to which the offense level for the offense of conviction . . . already reflects the risk of personal injury." *Id.*

If a physical injury results, the court must examine similar factors as in U.S.S.G. § 5K2.1, such as the defendant's state of mind or the manner in which the injury was caused, before enhancing the sentence. *See* U.S.S.G. § 5K2.2. In addition, the increase should be in proportion to "the extent of the injury, the degree to which it may prove permanent, and the extent to which the injury was intended or knowingly risked."[2] *Id.*

We employ a *de novo* standard for reviewing a "district court's legal conclusions regarding the application of the sentencing guidelines." *Miggins*, 302 F.3d at 390. Furthermore, the appellate court "review[s] a district court's decision to depart from the Guidelines sentencing range for abuse of discretion." *United States v. Chance*, 306 F.3d 356, 393 (6th Cir. 2002) (citation omitted).[3]

"Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the

---

[2] Koch argues that the district court did not take these factors sufficiently into account and erred because the death and the injury were neither intentional nor knowing. *See Def.'s Br.* at 19-21. The district court, however, found that Koch "intended to create the dangerous, emotionally charged standoff that ensued following his premeditated, boisterous, armed incursion to the very threshold of Justin Davis' home." (App. 33) This indicates that the district court considered the factors outlined in sections 5K2.1 and 5K2.2, such as Koch's state of mind, in making its finding. This issue is also tied to the causation issue discussed below.

[3] Here, Koch argues for a *de novo* review, while the government insists on the abuse of discretion standard. The federal courts, including the Sixth Circuit, employ both standards in departures from guidelines depending on whether and to what extent the question is legal or factual. As the Supreme Court stated in *Koon*, not much turns on the label chosen because a district court that made a mistake of law would have by definition abused its discretion. *See* 518 U.S. at 100.

heartland of cases in the Guideline." *Koon*, 518 U.S. at 98. "To resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing." *Id.* On the other hand, a case outside the "heartland" of cases "will be extremely rare." U.S.S.G. § 5K2.0 cmt.

In challenging the six-level upward departure from the guidelines, Koch first underlines the sentencing judge's statement, "I think the jury . . . cut Mr. Koch a break" on count 5 where the jury acquitted him. *See Def.'s Br.* at 9. Koch contends that by increasing the sentence, the judge "effectively charged, convicted, and sentenced Mr. Koch for Mr. Gibson's death and Mr. O'Brien's injuries without a grand jury indictment or a trial." *Id.* Koch further argues that the ten-year mandatory minimum sentence under section 924(c) adequately takes into account the risk of "violence that could result from the commission of the underlying offense." *Id.* at 13. Koch thus challenges the district court's decision that his case fell outside the heartland of cases covered by the applicable guideline under *Koon*. *See id.* at 14.

Koch references cases that explain the reason for the mandatory sentence under section 924(c) being the resultant risk of violence when drugs and guns come together. For example, in *United States v. Zamora*, the Ninth Circuit explained that "the mandatory sentencing provisions of section 924 exist because the possession of a gun during a drug trafficking offense increases the risk of violence." 37 F.3d 531, 533 (9th Cir. 1994) (citation omitted). Another example is an armed robbery case where the Sixth Circuit found that the applicable sentencing guideline adequately took into consideration that bank robbers frequently discharge firearms, and thereby struck down the enhancement. *See Def.'s Br.* at 17 (discussing *United States v. Bond*, 22 F.3d 662 (6th Cir. 1994)).

The government counters with three opinions where the courts found that death or serious injury takes the offense outside the heartland of cases covered by section 924(c) and the applicable guideline. *See Pl.'s Br.* at 18-19. In *United States v. Scheetz*, the sentencing court authorized a departure for the discharge of a firearm during a conspiracy to distribute marijuana (less than 50 kilograms) when a death and physical injury resulted, even though the defendant's culpability was found to be "at the low end of the spectrum." 293 F.3d 175, 191 (4th Cir. 2002). In *United States v. Philiposian*, 267 F.3d 214 (3d Cir. 2001), the court found that a two-level upward departure for permanent injury was warranted when the nature and extent of injuries (including psychological injuries) took the case "outside the heartland" of "permanent or life threatening injuries" in an aggravated assault charge for causing permanent injury. Additionally, in *Philiposian*, the defendant randomly picked a mail carrier as his victim in a sniper attack with an AK-47, a high-capacity, semiautomatic weapon. *See* 267 F.3d at 215. In *United States v. Bazile*, 30 Fed. Appx. 830, 2002 WL 203342 (10th Cir., Feb. 11, 2002), the court upheld an upward departure in a section 924(c) sentence when the defendant shot and physically injured two victims.

To allow a departure from the guidelines, the first question is whether a particular case falls outside the heartland of cases (brought under and implicating 18 U.S.C. § 924(c) and U.S.S.G. § 2K2.4(a)(2) (2001)), making it an "unusual" case. *Chance*, 306 F.3d at 393 (citing *Koon*). The district court may not depart from the guidelines if the case is a "heartland" case. The second question is whether the special factor (such as the existence of death or physical injury) is an "encouraged" factor to warrant an enhancement under the guidelines. "If the special factor is an encouraged factor, the sentencing court may depart if the applicable Guideline does not already take the factor into consideration." *Id.* If the guideline already takes the special factor into consideration, "the sentencing court should depart only if the factor is

present to a degree that makes the case different from the ordinary case where the factor is present." *Id.*[4]

Death and serious physical injury are "encouraged factors" for enhancement under U.S.S.G. §§ 5K2.1 and 5K2.2. The applicable sentencing guideline 2K2.4(a)(2) (2001), however, points to section 924(c) without mentioning death or physical injury. Section 924(c) in turn provides a mandatory minimum for using, carrying, and discharging a firearm during a drug offense, but does not indicate what the sentence should be if a death or physical injury occurred.

Here, the district court stated that "[s]ince Section 2K2.4 provides no sort of enhancement for the physical injuries and death that resulted from the defendant's actions, the court finds that this case is outside . . . the heartland of cases covered by this guideline." (App. 258A.) In arguing that this case is within the heartland, Koch indicates that *Zamora* (and other cases) explained that "the mandatory sentencing provisions of section 924 exist because the possession of a gun during a drug offense increases the risk of violence." 37 F.3d at 533. The issue therefore is whether the section 924 mandatory minimum adequately takes into account the possibility of violence.

There is no case cited by either party directly on point. In the cases cited by Koch (*Zamora* and *Bond*) no death or physical injury resulted. Here, the violence was not merely risked, but it actually occurred, causing a death and a serious injury. In the cases cited by the government (*Scheetz*, *Philiposian*, and *Bazile*) on the other hand, the defendant was the person who fired the shots that caused a death or physical

---

[4]In this opinion, only those parts of the *Chance* test that are pertinent to this case are discussed.

injury.[5]  Koch, however, did not directly cause the death or the injury here.  Koch urges that there must be a "stronger link [than found by the district court] between Koch's conduct and the death and physical injuries." *Def.'s Br.* at 19 (citation omitted).  The district court explained its decision as follows:

> Koch's actions were the catalysts that set off the gun battle that resulted in Bob Gibson's death and Pat O'Brien's serious physical injuries.  Although he may not have fired the fatal shot, Robbie Koch no doubt intended to create the dangerous, emotionally charged standoff that ensued following his premeditated, boisterous, armed incursion to the very threshold of Justin Davis' home.  But for Mr. Koch's aggressions, the shootout would never have taken place.

(App. 33.)

In other words, the district court authorized the upward departure because it found that Koch's actions were the "catalysts" that led to the death and the injury.

We agree.  The district court's enhancement was justified by the facts of this case.  But for Koch's actions, the tragedy at Davis' house would never have taken place.  Koch, who was at the center of the drug conspiracy, was upset about the prospect that his frontman Davis was cheating him.  To collect the money or to intimidate Davis or both Koch apparently thought a show of force was necessary.  To that end, Koch recruited three other men to come with him to Davis' residence.  Koch and the men took weapons with

---

[5]The government argues that *Scheetz* controls this case because the defendant there did not fire the shot that led to the death of one victim.  However, the defendant in *Scheetz* admitted that he fired shots at another victim who was injured.  Even though we find the *Scheetz* court's pronouncement on causation helpful in our ultimate decision to uphold the departure, *Scheetz* cannot control this case because Koch did not fire any of the shots that caused either the injury or the death.

them.  They arrived at Davis' residence at dawn, startling the inhabitants.  Koch banged on the door, and demanded that Davis and his roommate come out.  As a result of Koch's actions, the inhabitants reached for their guns and armed themselves.  Even though Koch did not kill or injure anybody directly, he is nevertheless responsible for the death and the injury as the primary instigator of the violence that inevitably ensued.  The district court was correct that it should have been reasonably foreseeable to him that his actions could lead to an injury or even death.

Neither the applicable sentencing guideline nor section 924(c) adequately contemplates the events that took place at Davis' residence on April 27, 2001.  Section 924(c) merely prescribes a mandatory minimum for the risk of violence that may result from carrying a firearm during a drug offense.  *Cf. Zamora*, 37 F.3d at 533.  The mandatory minimum does not preclude the imposition of a higher sentence when actual violence occurs and individuals are killed or seriously hurt.

Because this case is outside the heartland of the cases envisioned by section 924(c) and because Koch's conduct led to the death and physical injury, we sustain the upward departure on Koch's sentence.  As in *Scheetz*, there is "no basis for foreclosing a departure under U.S.S.G. § 5K2.1 or U.S.S.G. § 5K2.2 when a defendant helps put into motion a chain of events that risks serious injury or death, even when an intent to harm is entirely absent and the defendant was not directly responsible for the death."  293 F.3d at 191.

With respect to the magnitude of the increase, the district court "elect[ed] to employ a six-level increase similar to the increases for permanent or life threatening bodily injury found at sentencing guideline Section 2A2.2, aggravated assault; Section 2B3.1, robbery; and Section 2B3.2, extortion by force."  (App. 259.)  In U.S.S.G. § 2A2.2 (b)(3)(C), a six-level increase is provided for a "permanent or life-threatening bodily injury."  This is two levels higher than the increase level provided for "serious bodily injury."  In sections

2B3.1(b)(3)(C) and 2B3.2(b)(4)(C), the same increase is provided for the same injury. Here, the district court counted only O'Brien's injuries and not Gibson's death in the six-level departure by not increasing the level above six. Thus, the magnitude of the increase for both the death and the injury is reasonable.

## CONCLUSION

For all the foregoing reasons, we **AFFIRM** the judgment of the district court.